[L.A. No. 32301. Apr. 27, 1989.]

MARIA E. THING, Plaintiff and Appellant, v.
JAMES V. LA CHUSA et al., Defendants and Respondents.

646

COUNSEL

McDougal, Meloche, Love & Eckis, Donald L. Meloche and Patrick F. O'Connor for Plaintiff and Appellant.

Douglas K. deVries, Mart & deVries, Harvey Levine, Leonard Sacks, James McGrath, Ian Herzog, Browne Greene, Don Caffray, Sanford Gage, Charles O'Reilly and Robert Steinberg as Amici Curiae on behalf of Plaintiff and Appellant.

Gray, Cary, Ames & Frye, Marcelle E. Mihalla, William McCurine, Jr., Jeff L. Mangum and Marilyn L. Huff for Defendants and Repondents.

Fred J. Hiestand, Horvitz, Levy & Amerian, Ellis J. Horvitz, Peter Abrahams and Joan Wolff as Amici Curiae on behalf of Defendants and Respondents.

OPINION

EAGLESON, J.—The narrow issue presented by the parties in this case is whether the Court of Appeal correctly held that a mother who did not

witness an accident in which an automobile struck and injured her child may recover damages from the negligent driver for the emotional distress she suffered when she arrived at the accident scene. The more important question this issue poses for the court, however, is whether the "guidelines" enunciated by this court in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] are adequate, or if they should be refined to create greater certainty in this area of the law.

Although terms of convenience identify the cause of action here as one for negligent infliction of emotional distress (NIED) and the plaintiff as a "bystander"[1] rather than a "direct victim," the common law tort giving rise to plaintiff's claim is negligence. (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 730; *Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295, 314-315 [29 Cal.Rptr. 33, 379 P.2d 513].) It is in that context that we consider the appropriate application of the concept of "duty" in an area that has long divided this court—recognition of the right of persons, whose only injury is emotional distress, to recover damages when that distress is caused by knowledge of the injury to a third person caused by the defendant's negligence. Although we again find ourselves divided, we shall resolve some of the uncertainty over the parameters of the NIED action, uncertainty that has troubled lower courts, litigants, and, of course, insurers.

Upon doing so, we shall conclude that the societal benefits of certainty in the law, as well as traditional concepts of tort law, dictate limitation of bystander recovery of damages for emotional distress. In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and, (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness.

## I

### Background

On December 8, 1980, John Thing, a minor, was injured when struck by an automobile operated by defendant James V. La Chusa. His mother, plaintiff Maria Thing, was nearby, but neither saw nor heard the accident. She became aware of the injury to her son when told by a daughter that John had been struck by a car. She rushed to the scene where she saw her bloody and unconscious child, who she believed was dead, lying in the

---

[1] As our subsequent discussion will explain, the right to recover for NIED suffered as a result of observing the pain and suffering accompanying an injury to another, has been extended to plaintiffs who are neither "bystanders" present at the scene of the injury causing incident nor percipient witnesses "who view the defendant's negligent conduct."

roadway. Maria sued defendants, alleging that she suffered great emotional disturbance, shock, and injury to her nervous system as a result of these events, and that the injury to John and emotional distress she suffered were proximately caused by defendants' negligence.

The trial court granted defendants' motion for summary judgment, ruling that, as a matter of law, Maria could not establish a claim for negligent infliction of emotional distress because she did not contemporaneously and sensorily perceive the accident. Although prior decisions applying the guidelines suggested by this court in *Dillon* v. *Legg, supra,* 68 Cal.2d 728, compelled the ruling of the trial court, the Court of Appeal reversed the judgment dismissing Maria's claim after considering the decision of this court in *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159 [216 Cal.Rptr. 661, 703 P.2d 1]. The Court of Appeal reasoned that while Maria's argument, premised on *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518], that she was a direct victim of La Chusa's negligence, did not afford a basis for recovery, contemporaneous awareness of a sudden occurrence causing injury to her child was not a prerequisite to recovery under *Dillon*.

We granted review to consider whether *Ochoa* supports the holding of the Court of Appeal. We here also further define and circumscribe the circumstances in which the right to such recovery exists. To do so it is once again necessary to return to basic principles of tort law.

II

*Emotional Distress as a Compensable Item of Damage in Intentional Torts*

Although the theory of recovery in issue here is the tort of "negligence," recognition of emotional distress as a distinct item of damage for which recovery may be had even absent physical injury or impact is not limited to negligence actions. Indeed, recovery for intentional conduct that invades the individual's right to peace of mind was recognized long before such recovery was permitted in negligence actions. It is useful, therefore, to place emotional distress as a basis for a negligence action in perspective by briefly reviewing the development of common law recognition of a protectible interest in individual peace of mind—i.e., the right to be free from socially unacceptable conduct that seriously affects another's peace of mind.

The range of mental or emotional injury subsumed within the rubric "emotional distress" and for which damages are presently recoverable "includes fright, nervousness, grief, anxiety, worry, mortification, shock,

humiliation and indignity, as well as physical pain." (*Deevy* v. *Tassi* (1942) 21 Cal.2d 109, 120 [130 P.2d 389].)

Express or implicit recognition that peace of mind warrants legal protection is found in recovery for emotional distress as an aggravation of damages sought under intentional tort theories. Initially, emotional distress was recognized simply as an item of damages in those actions. With few exceptions, causing mental distress did not itself create a right of action, and where mental distress alone exists the common law rarely permitted recovery of damages. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 402, p. 483.)

Possibly the first exception to that limitation existed in recovery for assault. Assault is a tort which today recognizes the right of the individual to peace of mind, to live without fear of personal harm. "A civil action for assault is based upon an invasion of the right of a person to live without being put in fear of personal harm." (*Lowry* v. *Standard Oil Co.* (1944) 63 Cal.App.2d 1, 7 [146 P.2d 57].) It has been noted, however, that actions based on intentional conduct were originally authorized not in recognition of or to redress a right to mental tranquility, but to afford an alternate dispute resolution mechanism. Legal action was preferable to redress on the field of honor. (See Pearson, *Liability to Bystanders for Negligently Inflicted Emotional Harm—A Comment on the Nature of Arbitrary Rules* (1982) 34 U.Fla.L.Rev. 477, 486.)

Emotional distress is also an accepted item of damage that may be recovered in actions for abuse of process (*Spellens* v. *Spellens* (1957) 49 Cal.2d 210, 233 [317 P.2d 613]); false imprisonment (*Gill* v. *Epstein* (1965) 62 Cal.2d 611, 618 [44 Cal.Rptr. 45, 401 P.2d 397]); libel (*Scott* v. *Times-Mirror Co.* (1919) 181 Cal. 345, 365 [184 P. 672, 12 A.L.R. 1007]); and invasion of privacy. (*Melvin* v. *Reid* (1931) 112 Cal.App. 285 [297 P. 91].) Here, too, recovery has not been limited to circumstances in which the mental distress is an aggravation of a physical injury or impact.

Recognition of emotional distress as a compensable injury when caused by an intentional tort carried with it a judgment that the defendant's conduct was sufficiently outrageous or unacceptable that an award of damages was justified to punish the tortfeasor and deter such conduct by others. This development led in turn to a focus on the nature of the defendant's conduct, rather than on identifying a traditional tort to justify recovery for infliction

of emotional distress, and culminated in recognition of the tort now known as intentional infliction of emotional distress.[2]

With recognition of intentional infliction of emotional distress as a discrete tort cause of action, this court accepted both freedom from emotional distress as an interest worthy of protection in its own right, and the proposition that it is possible to quantify and compensate for the invasion of that interest through an award of monetary damages even when the severity of the emotional distress is not manifested in physical symptoms. "If a cause of action is otherwise established, it is settled that damages may be given for mental suffering naturally ensuing from the acts complained of [citations], and in the case of many torts, such as assault, battery, false imprisonment, and defamation, mental suffering will frequently constitute the principal element of damages. [Citation.] In cases where mental suffering constitutes a major element of damages it is anomalous to deny recovery because the defendant's intentional misconduct fell short of producing some physical injury." (*State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 338 [240 P.2d 282].)

In *Siliznoff*, the court rejected arguments that permitting recovery for emotional distress without proof of physical injury would invite fraudulent claims and create difficulties in proof that serious mental distress resulted from the tortious conduct. The court reasoned that the defendant's conduct

---

[2] As one treatise summarizes the shift: "In many instances where the only substantial harm was emotional, recovery was allowed by finding some traditional legal peg on which to hang it. Thus if the court could find a battery or trespass, however technical, it was much less reluctant to uphold plaintiff's claim for mental suffering. Gradually, however, the understanding grew that resort to such devices obscured the principle that best explained the holdings of the courts. A more general willingness to provide for liability, where the harm was intentionally or even recklessly inflicted, emerged. The character of the defendant's behavior became of prime importance." (2 Harper et al., The Law of Torts (2d ed. 1986) pp. 606-607, fns. omitted.)

Prosser and Keaton on Torts explains: "The early cases refused all remedy for mental injury, unless it could be brought within the scope of some already recognized tort. Thus it was held that mere words, however violent, threatening or insulting, did not constitute an assault, and hence afforded no ground for redress. It might well be inquired why the trespass action for assault, which was a remedy designed to keep the peace, never was extended to words which were more insulting, unendurable, and generally provocative than blows. Perhaps it was the proximity of the criminal law, with its fixed notion that assault must always be something in the nature of an attempted battery. In any event, the result was a rule which permitted recovery for a gesture that might frighten the plaintiff for a moment, and denied it for menacing words which kept the plaintiff in terror for a month. But if some independent tort, such as assault, battery, false imprisonment, or seduction could be made out, the cause of action served as a peg upon which to hang the mental damages, and recovery was freely permitted. Such 'parasitic' damages were the entering wedge.

"It has gradually become recognized that there is no magic inherent in the name given to a tort, or in any arbitrary classification, and that the infliction of mental injury may be a cause of action in itself." (Prosser and Keeton on Torts (5th ed. 1984) pp. 56-57.)

often afforded greater proof of a serious invasion of the victim's mental tranquility than did the presence or absence of resulting physical symptoms. (*Ibid.*)

## III

### *Limitations in Negligence Actions*

A parallel line of negligence cases permitting recovery of damages for emotional distress had developed in California at the time *Siliznoff, supra,* 38 Cal.2d 330, was decided. Initially, however, in negligence cases the right to recover for emotional distress had been limited to circumstances in which the victim was himself injured and emotional distress was a "parasitic" item of damages, or if a plaintiff who had been in the "zone of danger" did not suffer injury from impact, but did suffer physical injury as a result of the emotional trauma. (See *Webb* v. *Francis J. Lewald Coal Co.* (1931) 214 Cal. 182, 184 [4 P.2d 532, 77 A.L.R. 675]; *Lindley* v. *Knowlton* (1918) 179 Cal. 298, 301-302 [176 P. 440].)

Where the conduct was negligent, emotional distress caused solely by fear for a third person's safety or apprehension of injury to the third person, was first recognized as an injury for which damages could be sought in *Dillon* v. *Legg, supra,* 68 Cal.2d 728.

But shortly before *Dillon,* in *Amaya* v. *Home Ice, Fuel & Supply Co., supra,* 59 Cal.2d 295, the court had declined the opportunity to broaden the right to recover for emotional distress. *Amaya,* after confirming that the "impact rule" making a contemporaneous physical impact a prerequisite to recovery for negligently induced fright or shock was not applicable in California, held damages could not be recovered by persons outside the zone of danger created by the defendant's negligence even when that shock was reflected in physiological symptoms. The court quoted with approval the statement of the general rule of nonliability for nervous shock induced by fear for a third party applied by the Court of Appeal in *Reed* v. *Moore* (1957) 156 Cal.App.2d 43 [319 P.2d 80]: " 'As a general rule, no recovery is permitted for a mental or emotional disturbance, or for a bodily injury or illness resulting therefrom, in the absence of a contemporaneous bodily contact or independent cause of action, or an element of wilfulness, wantonness, or maliciousness, in cases in which there is no injury other than one to a third person, even though recovery would have been permitted had the wrong been directed against the plaintiff. The rule is frequently applied to mental or emotional disturbances caused by another's danger, or sympathy for another's suffering. It has been regarded as applicable to a mental or emotional disturbance resulting from an injury not only to a stranger, but

also to a relative of the plaintiff, such as a child, sister, father, or spouse.'" (59 Cal.2d at pp. 302-303.)

The court explained the restriction on the right to recover damages for emotional distress in negligence actions on the ground that the defendant had not breached a legal duty to the plaintiff. The court concluded that existence of a duty could not be defined, or left to the jury to find, on the basis of whether the injury was foreseeable. Rather the existence and scope of the defendant's duty in this context was one for the court.

Several factors led to that conclusion. First was the observation that there are circumstances in which although a foreseeable risk exists, there is no duty to avoid creation of that risk. Another was the then prevalent view of other courts and commentators that the type of harm—fright or nervous shock with consequent bodily illness induced solely by apprehension of danger to another person—was not reasonably foreseeable. Ultimately, however, the court weighed the interest of the plaintiff in freedom from invasion of mental tranquility against the costs involved in recognizing a duty and concluded that factors militating against recognition of a legal duty to the third party plaintiff predominated.

First among these policy considerations was efficient administration of justice. The court's concern here was the possibility of fraud and the difficulty in resolving disputes among witnesses over the extent and severity of the injury where negligent conduct rather than intentional conduct allegedly produced the emotional distress. A second important administrative factor was concern that it would be impossible to limit the circumstances in which liability would exist for emotional distress caused by apprehension of danger or injury not to the plaintiff but to a third person. The court concluded, also, that socioeconomic and moral factors mandate that there be some limit to the liability of the negligent actor. (*Amaya, supra,* 59 Cal.2d at pp. 312-313.)

The concept of relative fault weighed equally with the administrative concerns. "As long as our system of compensation is based on the concept of fault, we must also weigh 'the moral blame attached to the defendant's conduct.' [Citation omitted.] Here is felt the difference between the social importance of conduct that negligently causes harm and conduct that is intended to do so. It is often said that in the latter case the defendant will be held liable for a broader range of consequences because, as the consequences are intended, they are the more 'foreseeable.' But in many intentional tort cases the defendant has been held liable under this reasoning for consequences far beyond those which he actually intended. [Citation.] It follows that, once more, 'foreseeability' is not the real answer. Rather, the increased

liability imposed on an intentional wrongdoer appears to reflect the psychological fact that solicitude for the interests of the actor weighs less in the balance as his moral guilt increases and the social utility of his conduct diminishes." (59 Cal.2d at p. 315.)

The *Amaya* view was short lived, however. Only five years later, the decision was overruled in *Dillon* v. *Legg, supra,* 68 Cal.2d 728. In the ensuing 20 years, like the pebble cast into the pond, *Dillon*'s progeny have created ever widening circles of liability. Post-*Dillon* decisions have now permitted plaintiffs who suffer emotional distress, but no resultant physical injury, and who were not at the scene of and thus did not witness the event that injured another, to recover damages on grounds that a duty was owed to them solely because it was foreseeable that they would suffer that distress on learning of injury to a close relative.

In *Dillon* itself, the issue was limited. The mother and sister of a deceased infant each sought damages for "great emotional disturbance and shock and injury to her nervous system" which had caused them great mental pain and suffering. Allegedly these injuries were caused by witnessing the defendant's negligently operated vehicle collide with and roll over the infant as she lawfully crossed a street. The mother was not herself endangered by the defendant's conduct. The sister may have been. The trial court had therefore granted the defendant's motion for judgment on the pleadings as to the mother, but had denied it with respect to the sister of the decedent. Faced with the incongruous result demanded by the "zone of danger" rule which denied recovery for emotional distress and consequent physical injury unless the plaintiff himself had been threatened with injury, the court overruled *Amaya*.

Reexamining the concept of "duty" as applicable to the *Dillon* facts, the court now rejected the argument that the possibility of fraudulent claims justified denial of recovery, at least insofar as a mother who sees her child killed is concerned, as "no one can seriously question that fear or grief for one's child is as likely to cause physical injury as concern over one's own well-being." (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 736.) The court held instead that the right to recover should be determined by application of "the neutral principles of foreseeability, proximate cause and consequential injury that generally govern tort law." (*Id.,* at p. 737.)

The difficulty in defining the limits on recovery anticipated by the *Amaya* court was rejected as a basis for denying recovery, but the court did recognize that "to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant at the time were reasonably

foreseeable." (*Dillon, supra,* 68 Cal.2d at p. 739.) Thus, while the court indicated that foreseeability of the injury was to be the primary consideration in finding duty, it simultaneously recognized that policy considerations mandated that infinite liability be avoided by restrictions that would somehow narrow the class of potential plaintiffs. But the test limiting liability was itself amorphous.[3]

In adopting foreseeability of the injury as the basis of a negligent actor's duty, the *Dillon* court identified the risks that could give rise to that duty as both physical impact and emotional disturbance brought on by the conduct. Having done so, the *Dillon* court conceded: "We cannot now predetermine defendant's obligation in every situation by a fixed category; no immutable rule can establish the extent of that obligation for every circumstance of the future." (68 Cal.2d at p. 740.) In an effort to give some initial definition to this newly approved expansion of the cause of action for NIED the court enunciated "guidelines" that suggested a limitation on the action to circumstances like those in the case before it.

"We note, first, that we deal here with a case in which plaintiff suffered a shock which resulted in physical injury and we confine our ruling to that case. In determining, in such a case, whether defendant should reasonably foresee the injury to plaintiff [mother], or in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from

---

[3] Because a general duty exists to avoid causing foreseeable injury to another, the concept of "foreseeability" enters into both the willingness of the court to recognize the existence of a duty, the breach of which permits an action for damages, and into the determination by a trier of fact whether the specific injury in issue was foreseeable. The court explained the distinction in *Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 573, footnote 6 [224 Cal.Rptr. 664, 715 P.2d 624]: "[A] court's task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.

"The jury, by contrast, considers 'foreseeability' in two more focused, fact-specific settings. First, the jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the jury's determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury."

In the present context, however, we are concerned not with whether an injury is "foreseeable" as a result of the negligent conduct. As the court recognized in *Dillon, supra,* 68 Cal.2d 728, it is no less "foreseeable" that a person outside the "zone of danger" will suffer emotional distress on observing the injury of a close relative than it is that this person would suffer such distress if he or she were also threatened with injury. Thus, the court's role in deciding whether a "duty" to these persons should be recognized does not depend solely on the "foreseeability" of the emotional distress, but on these policy considerations.

it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

"The evaluation of these factors will indicate the *degree* of the defendant's foreseeability; obviously defendant is more likely to foresee that a mother who observes an accident affecting her child will suffer harm than to foretell that a stranger witness will do so. Similarly, the degree of foreseeability of the third person's injury is far greater in the case of his contemporaneous observance of the accident than that in which he subsequently learns of it. The defendant is more likely to foresee that shock to the nearby, witnessing mother will cause physical harm than to anticipate that someone distant from the accident will suffer more than a temporary emotional reaction. All of these elements, of course, shade into each other; the fixing of the obligation, intimately tied into the facts, depends upon each case.

"In light of these factors the court will determine whether the accident and harm was *reasonably* foreseeable. Such reasonable foreseeability does not turn on whether the particular [defendant] as an individual would have in actuality foreseen the exact accident and loss; it contemplates that *courts, on a case-to-case basis, analyzing all the circumstances, will decide what the ordinary man under such circumstances should reasonably have foreseen.* The courts thus mark out the areas of liability, excluding the remote and unexpected." (*Dillon, supra,* 68 Cal.2d at p. 741. Italics added.)

The *Dillon* court anticipated and accepted uncertainty in the short term in application of its holding, but was confident that the boundaries of this NIED action could be drawn in future cases. In sum, as former Justice Potter Stewart once suggested with reference to that undefinable category of materials that are obscene, the *Dillon* court was satisfied that trial and appellate courts would be able to determine the existence of a duty because the court would know it when it saw it.[4] Underscoring the questionable validity of that assumption, however, was the obvious and unaddressed problem that the injured party, the negligent tortfeasor, their insurers, and their attorneys had no means short of suit by which to determine if a duty such as to impose liability for damages would be found in cases other than those that were "on all fours" with *Dillon.* Thus, the only thing that was foreseeable from the *Dillon* decision was the uncertainty that continues to this time as to the parameters of the third party NIED action.

---

[4]See *Jacobellis* v. *Ohio* (1964) 378 U.S. 184, 197 [12 L.Ed.2d 793, 803-804, 84 S.Ct. 1676] (conc. opn. of Stewart, J.).

## IV

### *Post-Dillon Extension*

The expectation of the *Dillon* majority that the parameters of the tort would be further defined in future cases has not been fulfilled. Instead, subsequent decisions of the Courts of Appeal and this court, have created more uncertainty. And, just as the "zone of danger" limitation was abandoned in *Dillon* as an arbitrary restriction on recovery, the *Dillon* guidelines have been relaxed on grounds that they, too, created arbitrary limitations on recovery. Little consideration has been given in post-*Dillon* decisions to the importance of avoiding the limitless exposure to liability that the pure foreseeability test of "duty" would create and towards which these decisions have moved.

Several post-*Dillon* decisions of this court are particularly noteworthy in this expansive progression. In the first, *Krouse v. Graham* (1977) 19 Cal.3d 59 [137 Cal.Rptr. 863, 562 P.2d 1022], this court held that the NIED plaintiff need not "visually" perceive the third party injury to satisfy the *Dillon* guideline suggesting that the plaintiff suffer shock from " 'the sensory and contemporaneous observance of the accident, . . .' " It was sufficient that the plaintiff knew the position of his wife just outside the automobile in which he was seated the instant before she was struck by defendant's automobile which he had seen and realized was going to strike her. He was, therefore, a "percipient witness to the impact causing [her] injuries." (19 Cal.3d 59, 76.)

We also find in *Krouse, supra,* 19 Cal.3d 59, the roots of the uncertainty reflected by the instant case over whether the plaintiff must perceive the injury causing incident at all or may recover for emotional distress suffered on viewing its "immediate consequences" even though not present at the scene when it occurred. *Krouse* created uncertainty as to the meaning and importance of the plaintiff's status as a "percipient witness" by approving the conclusion of the Court of Appeal in *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253 [79 Cal.Rptr. 723], that visual perception of the accident was not required without commenting on the context in which the *Archibald* court made its ruling. That decision had allowed recovery by a mother who "did not actually witness the tort but viewed the child's injuries within moments after the occurrence of the injury-producing event." (275 Cal.App.2d 253, 255.) Thus, it appeared that this court agreed that persons who were not present at the accident scene could recover damages for the emotional distress they later suffered when told by others of the injury to their loved one or when they later came to the scene.

*Krouse, supra,* 19 Cal.3d 59, was followed by *Justus* v. *Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122], in which the court identified the issue as whether the plaintiff fathers' causes of action for the emotional impact of observing the stillborn birth of their children satisfied the *Dillon* guideline of shock resulting from a direct emotional impact from the sensory and contemporaneous observance of an "accident." The court did not decide this question, ruling instead that the plaintiffs could not recover because neither had learned of the death of the fetus until informed by a doctor. Thus the "disabling shock" occurred only upon being informed by another of the injury. (19 Cal.3d 564, 585.) By implication, however, it seemed that the injury producing event need not be a sudden occurrence or accident.

However, the court in *Hoyem* v. *Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 523 [150 Cal.Rptr. 1, 585 P.2d 851], reaffirmed the requirement that the shock or emotional distress necessary to a cause of action for NIED under *Dillon* must "result from a 'direct emotional impact' on the plaintiff caused by 'sensory and contemporaneous observance of the accident.' "

But in *Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553 [145 Cal.Rptr. 657], after considering this court's post-*Dillon* decisions and those of the Courts of Appeal, including *Archibald* v. *Braverman, supra,* 275 Cal.App.2d 253, the concept of contemporaneous observance was broadened. The court held that a mother who, while searching for her missing three-year-old child, heard a neighbor scream his name, realized the child must have fallen into the neighbor's pool, and saw the child being pulled from the pool and given cardiopulmonary resuscitation as she ran up, could state a cause of action under *Dillon*. The court reasoned that it was not necessary that the plaintiff perceive the accident if she suffered physical harm that resulted from "the direct emotional impact from the contemporaneous observation of the immediate consequences of the defendants' negligent act, which was the proximate cause of the injury and death of her son." (*Nazaroff, supra,* 80 Cal.App.3d 553, 566.) The court explained that the plaintiff may have mentally reconstructed the accident and the child might still have been experiencing the injuries caused by the defendants' negligence when his mother first observed him.

With the *Nazaroff* decision, *supra,* 80 Cal.App.3d 553, therefore, the *Dillon* guideline of sensory perception of an accident or injury was no longer considered a prerequisite to recovery. It was still necessary, however, that the plaintiff who had witnessed the immediate consequences of an injury producing incident suffer emotional distress sufficient to result in physical injury.

Both the physical harm and accident or sudden occurrence elements were eliminated, however, in *Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916, at least as to those plaintiffs who could claim to be "direct victims" of the defendant's negligence. The court held in *Molien* that a defendant hospital and doctor owed a duty directly to the husband of a patient who had been diagnosed erroneously as having syphilis, and had been told to so advise the husband in order that he could receive testing and, if necessary, treatment.

In finding the existence of a duty to the husband of the patient, the court reasoned that the risk of harm to the husband was reasonably foreseeable, and that the tortious conduct was directed to him as well as the patient. (*Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916, 922.) The status of the plaintiff mother in *Dillon* was distinguished as she suffered her injury solely as a "percipient witness" to the infliction of injury on another. She was therefore a "bystander" rather than a "direct victim."

The court did not further explain this distinction, or its relevance to whether the plaintiff should be allowed to recover damages for emotional distress. Both decisions had looked to the relationships of the parties to find foreseeability of the injury and thus a "duty to the plaintiff." The basis for finding a duty to the mother in *Dillon* was the foreseeability of her emotional distress to "the negligent driver who causes the death of a young child [and] may reasonably expect that the mother will not be far distant and will upon witnessing the accident suffer emotional trauma." (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 741.) In *Molien,* "[t]he risk of harm to plaintiff was reasonably foreseeable to defendants. It is easily predictable that an erroneous diagnosis of syphilis and its probable source would produce marital discord and resultant emotional distress to a married patient's spouse; [the physician's] advice to Mrs. Molien to have her husband examined for the disease confirms that plaintiff [husband] was a foreseeable victim of the negligent diagnosis. . . . [¶] We thus agree with plaintiff that the alleged tortious conduct of defendant was directed to him as well as to his wife. Because the risk of harm to him was reasonably foreseeable we hold . . . that under these circumstances defendants owed plaintiff a duty to exercise due care in diagnosing the physical condition of his wife." (27 Cal.3d 916, 923.)

*Molien* neither established criteria for characterizing a plaintiff as a "direct" victim, nor explained the justification for permitting "direct" victims to recover when "bystander" plaintiffs could not. The immediate effect of the decision, however, was to permit some persons who had no prior relationship with the defendant that gave rise to a duty, who did not suffer physical injury as a result of emotional distress, who did not observe the

negligent conduct, and who had not been at or near the scene of the negligent act to recover for emotional distress on a pure foreseeability-of-the injury basis. The limitations on recovery for emotional distress that had been suggested in the *Dillon* "guidelines" were not applicable to "direct" victims of a defendant's negligence.

The subtleties in the distinction between the right to recover as a "bystander" and as a "direct victim" created what one Court of Appeal has described as an "amorphous nether realm" (*Newton* v. *Kaiser Foundation Hospitals* (1986) 184 Cal.App.3d 386, 391 [228 Cal.Rptr. 890]; *Andalon* v. *Superior Court* (1984) 162 Cal.App.3d 600, 610 [208 Cal.Rptr. 899]), and have contributed in some measure to the present difficulty in defining the scope of an NIED action.[5] In *Andalon* v. *Superior Court, supra,* 162 Cal.App.3d 600, the court found that a physician's duty arose out of contract, after it had abandoned the effort to resolve the "direct" or "bystander" dilemma: "The problem which arises from this cryptic explanation is: how are we to distinguish between 'direct victim' cases and 'bystander' cases? An impression is given that the foreseeability of the particular injury to the husband alone explains the result. The inference suggested is that a 'direct victim' is a person whose emotional distress is a reasonably foreseeable consequence of the conduct of the defendant. This does not provide criteria which delimit what counts as reasonable foreseeability. It leads into the quagmire of novel claims which the Supreme Court foresaw as an unacceptable consequence of a 'pure' foreseeability analysis . . . ." (162 Cal.App.3d at p. 609.)

"[F]oreseeability," the court noted later in *Newton* v. *Kaiser Foundations Hospitals, supra,* 184 Cal.App.3d 386, 391, "is endless because foreseeability, like light, travels indefinitely in a vacuum." *Molien, supra,* 27 Cal.3d 916, thus, left to future cases the "unenviable tasks of distinguishing bystander from direct victim cases and establishing limits for the latter . . . with a 'foreseeable' diversity of results." (*Newton, supra,* 184 Cal.App.3d at p. 390.)

The *Dillon-Molien* waters, described by the Court of Appeal in this case as "murky," were further muddied when the right to recover in the negligence action was expanded to include "bystander" plaintiffs who suffered emotional distress, but no contemporaneous or consequential physical injury. We had reasoned in *Molien* that the requirement of physical injury was no more necessary to ensure that a claim of serious emotional distress is

---

[5] Less charitable comment on the purported distinction between "bystander" and "direct victim" plaintiffs has criticized it as "analytically unsound." (Pearson, *Liability to Bystanders for Negligently Inflicted Emotional Harm—A Comment on the Nature of Arbitrary Rules, supra,* 34 U.Fla.L.Rev. at p. 515.)

genuine in NIED actions than it was in actions for intentional infliction of emotional distress. Rather the question was one of proof to be left to the jury. (*Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916, 930.)

Cases subsequent to *Molien* assumed that the reasoning which led the court to abandon the physical-injury requirement extended to "bystander" NIED actions. Physical manifestation of the serious nature of the mental distress suffered by the plaintiff was no longer an element of the cause of action. (See *Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159; *Hedlund* v. *Superior Court* (1983) 34 Cal.3d 695, 706, fn. 8 [194 Cal.Rptr. 805, 669 P.2d 41, 41 A.L.R.4th 1063].)

*Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159, 172, partially explained and limited "direct victim" recovery under *Molien, supra,* 27 Cal.3d 916, to situations in which the defendant's negligence is "by its very nature directed at" the plaintiff. However, *Ochoa* also indicated that the dimensions of the NIED tort might be expanded further for "bystander" plaintiffs. *Ochoa* confirmed that recovery was permitted even though the injury producing event was not sudden or accidental, and even though its negligent cause was not immediately apparent. The court observed that the factors set forth in *Dillon* had been offered only as guidelines, and suggested that none was essential to recovery for NIED. Foreseeability that the injury would cause emotional distress was the proper inquiry. (*Ochoa, supra,* at p. 170.)

That dictum in *Ochoa* was broader than the issue presented in *Ochoa,* however. The plaintiff mother had observed the effects of the defendants' negligent failure to diagnose and properly treat the illness of her teenage son. Her observation of his pain and suffering, and his deteriorating condition, as the defendants failed to either properly care for him or accede to her entreaty that she be permitted to obtain care for him, was the cause of the emotional distress for which she sought to recover. The allegations of the complaint satisfied only two of the *Dillon* factors—she was at the scene of the negligent injury producing conduct and was closely related to the person whose physical injury caused her distress. Defendants' negligence in failing to give proper medical treatment, however, was not a sudden accidental occurrence and thus the second *Dillon* factor was not met: "Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, . . ." (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 740-741.)

This court, after reviewing several decisions of the Courts of Appeal which had limited recovery for NIED to percipient witnesses of a "sudden occurrence," held that this requirement was an unwarranted restriction on the cause of action authorized in *Dillon*. "Such a restriction arbitrarily

limits liability when there is a high degree of foreseeability of shock to the plaintiff and the shock flows from an abnormal event, and, as such, unduly frustrates the goal of compensation—the very purpose which the cause of action was meant to further." (*Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159, 168.)

*Ochoa* also held that the NIED plaintiff need not be aware that the conduct was "tortious." Reasoning that such a requirement leads to anomalous results, the court held that "when there is observation of the defendant's conduct and the child's injury and contemporaneous awareness the defendant's conduct or lack thereof is causing harm to the child, recovery is permitted." (*Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159, 170.) Thus, the plaintiff in that case did not have to know that the defendants had negligently misdiagnosed her son. It was enough that she knew that they were refusing or neglecting to give him additional treatment and this was the cause of the additional injury he was suffering.

In sum, however, as to "bystander" NIED actions, *Ochoa* held only that recovery would be permitted if the plaintiff observes both the defendant's conduct and the resultant injury, and is aware at that time that the conduct is causing the injury.[6] The Court of Appeal erred in concluding that *Ochoa, supra,* 39 Cal.3d 159, held that these NIED plaintiffs need not witness the defendant's conduct.

V

*Clarification of the Right to Recover for NIED*

Not surprisingly, this "case-to-case" or ad hoc approach to development of the law that misled the Court of Appeal in this case has not only produced inconsistent rulings in the lower courts, but has provoked considerable critical comment by scholars who attempt to reconcile the cases. (See Rabin, *Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment* (1985) 37 Stan.L.Rev. 1513, 1524-1526, hereafter *Rabin*; Diamond, *Dillon v. Legg Revisited: Toward a Unified Theory of Compensating Bystanders and Relatives for Intangible Injuries* (1984) 35 Hastings L.J. 477,

---

[6]Under criteria that permit recovery by close relatives who suffer shock and trauma from their sensory perception of the defendant's conduct and their relative's injury, if the traumatized reaction was foreseeable, *Ochoa* upheld not only a cause of action by the mother of the deceased child, but also the father whose complaint alleged that he had visited the child only once and "was extremely distressed by what he saw." (39 Cal.3d 159, 165, fn. 6.) His recovery was limited, however, to the distress suffered on the one occasion on which he witnessed the apparent neglect of his son by the defendants. He was not permitted to recover for distress suffered when he learned from his wife after her subsequent visits to the child of the continuing neglect of and suffering experienced by the child.

hereafter *Diamond*; Bell, *The Bell Tolls: Toward Full Tort Recovery for Psychic Injury* (1984) 36 U.Fla.L.Rev. 333; Pearson, *Liability for Negligently Inflicted Psychic Harm: A Response to Professor Bell* (1984) 36 U.Fla.L.Rev. 413; Nolan & Ursin, *Negligent Infliction of Emotional Distress: Coherence Emerging from Chaos* (1982) 33 Hastings L.J. 583, 620; Miller, *The Scope of Liability for Negligent Infliction of Emotional Distress: Making "The Punishment Fit the Crime"* (1979) 1 Hawaii L.Rev. 1, hereafter *Miller*; Pearson, *Liability to Bystanders for Negligently Inflicted Emotional Harm—A Comment on the Nature of Arbitrary Rules* (1982) 34 U.Fla.L.Rev. 477; Comment, Dillon Revisited: Toward a Better Paradigm for Bystander Cases (1982) 43 Ohio St. L.J. 931, 948; Note, *Limiting Liability for the Negligent Infliction of Emotional Distress: The "Bystander Recovery" Cases* (1981) 54 So.Cal.L.Rev. 847; Note, *Molien v. Kaiser Foundation Hospitals: California's New Tort of Negligent Infliction of Serious Emotional Distress* (1982) 18 Cal. Western L.Rev. 101; Note, *Negligent Infliction of Emotional Distress: Reconciling the Bystander and Direct Victim Causes of Action* (1983) 18 U.S.F. L.Rev. 145.)

Proposals to eliminate the arbitrary results of the proliferating, inconsistent and often conflicting *Dillon* progeny include the suggestion that recovery be allowed in any case in which recovery for physical injury is permitted. (See *Ochoa v. Superior Court, supra,* 39 Cal.3d 159, 178 [conc. opn. of Grodin, J.].) Another would limit recovery to the close-relatives class contemplated by *Dillon,* but allow recovery whenever mental distress to the plaintiff was foreseeable. (*Id.* at p. 196, conc. & dis. opn. of Bird, C. J.) At the other extreme, respondent here and amicus curiae Association for California Tort Reform argue, in essence, that the *Dillon* "guidelines" should be recognized as substantive limitations or elements of the tort.

In his thoughtful article documenting the conflicting and sometimes arbitrary results of attempts by lower courts to apply *Dillon* and *Molien,*[7] Professor Diamond analyzes the "flaws" in the *Dillon* analysis which he believes have contributed to the problem. He concludes that the *Dillon*-based cause of action identifies a "duty" on the basis of the purely fortuitous circumstances in which an injury occurs. As a result, when recovery for emotional distress alone is permitted under the *Dillon* guidelines, "foreseeability" is not a realistic indicator of potential liability and does not afford a rational limitation on recovery. Nor, Diamond suggests, do the *Dillon* guidelines, particularly under the expanded right to recovery created by *Molien* (and, we note, *Ochoa*), provide such limitation. In his view, only one of the *Dillon* guidelines is even relevant to foreseeability—the relationship of the plaintiff to the person suffering physical injury—because it is foresee-

---

[7] *Diamond, supra,* 35 Hastings L.J. 477.

able that the emotional distress suffered by a close relative on witnessing that injury will be greater than that of a stranger. (*Diamond, supra,* 35 Hastings L.J., at pp. 487-489.)

Diamond argues that the fact that it is foreseeable that a close relative will suffer psychological trauma at witnessing the injury does not adequately limit liability for damages for such intangible losses. When recovery for emotional distress was permitted only as an item of "parasitic" damage suffered by a plaintiff who had been physically injured, the defendant's exposure was limited by more predictable factors. Foreseeability that various activities may cause physical injury limits the potential universe of persons who may be harmed. This, in turn, by limiting the negligent actor's exposure makes it possible to protect potential victims and the defendant through insurance or other risk-spreading mechanisms whose cost is more closely related to the risk, and ensures that this exposure bears a more rational relationship to the defendant's culpability. (*Diamond, supra,* 35 Hastings L.J., at pp. 490-493.)

Another scholar suggests that any foreseeable plaintiff be permitted to recover for NIED and loss of filial consortium, but only for economic loss, thereby reconciling the divergent paths and limitations on recovery for noneconomic damages in these related torts with that permitted in actions for wrongful life. (See *Miller, supra,* 1 Hawaii L.Rev., at pp. 39-41.) Diamond agrees that this solution would permit recovery by all foreseeable plaintiffs in "intangible" tort cases, while restricting recovery to "economically acceptable" limits. (*Diamond, supra,* 35 Hastings L.J., at p. 480.)

In the NIED context, however, permitting recovery of economic damages by all foreseeable plaintiffs would expose defendants to risks no less arbitrary and unacceptable than those presently existing. While the recovery by individual victims might be less, the number of potential plaintiffs traumatized by reason of defendant's negligent conduct toward another, would turn on fortuitous circumstances wholly unrelated to the culpability of the defendant.

Our own prior decisions identify factors that will appropriately circumscribe the right to damages, but do not deny recovery to plaintiffs whose emotional injury is real even if not accompanied by out-of-pocket expense. Notwithstanding the broad language in some of those decisions, it is clear that foreseeability of the injury alone is not a useful "guideline" or a meaningful restriction on the scope of the NIED action. The *Dillon* experience confirms, as one commentator observed, that "[f]oreseeability proves too much. . . . Although it may set tolerable limits for most types of physical harm, it provides virtually no limit on liability for nonphysical harm."

(*Rabin, supra,* 37 Stan. L. Rev. at p. 1526.) It is apparent that reliance on foreseeability of injury alone in finding a duty, and thus a right to recover, is not adequate when the damages sought are for an intangible injury. ■ In order to avoid limitless liability out of all proportion to the degree of a defendant's negligence, and against which it is impossible to insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited.

We acknowledged and addressed one aspect of this problem in *Elden* v. *Sheldon* (1988) 46 Cal.3d 267 [250 Cal.Rptr. 254, 758 P.2d 582], holding that cohabitation, without formal marriage, did not constitute the close relationship contemplated by the *Dillon* guidelines and that foreseeability of injury alone does not justify imposition of liability for negligently caused emotional distress. In so doing, we again recognized that policy considerations justify restrictions on recovery for emotional distress notwithstanding the sometimes arbitrary result, and that the court has an obligation to establish those restrictions. *Elden* confirmed that those policy considerations include both the burden on the courts in applying vaguely defined criteria and the importance of limiting the scope of liability for negligence. If the consequences of a negligent act are not limited an intolerable burden is placed on society. A "bright line in this area of the law is essential." (46 Cal.3d 267, 277.)

The issue resolved in *Elden* was too narrow to create that "bright line" for all NIED actions. This case, however, presents a broader question and thus affords the court a better opportunity to meet its obligation to create a clear rule under which liability may be determined. In so doing we balance the impact of arbitrary lines which deny recovery to some victims whose injury is very real against that of imposing liability out of proportion to culpability for negligent acts. We also weigh in the balance the importance to the administration of justice of clear guidelines under which litigants and trial courts may resolve disputes. Thus, as we did in *Elden, supra,* 46 Cal.3d 267, we return to the concerns which prompted the *Amaya* court, *supra*, 59 Cal.2d 295, to deny recovery for negligent infliction of emotional distress.

Among the concerns of the *Amaya* court was the social cost of imposing liability on a negligent tortfeasor for all foreseeable emotional distress suffered by relatives who witnessed the injury. The court again faced this problem in *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858], in which the court was asked to recognize a child's right to recover for the loss of a parent's consortium, an action that, like NIED, seeks monetary damages for mental or emotional loss. Refusing to permit such "filial" consortium actions, the court concluded that the cause of action for loss of consortium must be narrowly circumscribed.

"Loss of consortium is an intangible injury for which money damages do not afford an accurate measure or suitable recompense; recognition of a right to recover for such losses . . . may substantially increase the number of claims asserted in ordinary accident cases, the expense of settling or resolving such claims, and the ultimate liability of the defendants." (*Id.* at p. 444.) The decision, we explained, was one of policy. We reasoned that we could not "ignore the social burden of providing damages . . . merely because the money to pay such awards comes initially from the 'negligent' defendant or his insurer. Realistically the burden . . . must be borne by the public generally in increased insurance premiums or, otherwise, in the enhanced danger that accrues from the greater number of people who may choose to go without any insurance. We must also take into account the cost of administration of a system to determine and pay [the] awards; . . ." (*Id.* at p. 447.)

While we emphasized in *Borer, supra,* 19 Cal.3d 441, that our refusal to extend the right to recover damages in consortium cases did not signal a refusal to allow damages for intangible losses in other contexts, the policy bases for the decision are relevant to defining the NIED cause of action. Crucial to the *Borer* decision were the intangible nature of the loss, the inadequacy of monetary damages to make whole the loss, the difficulty in measuring the damage, and the societal cost of attempting to compensate the plaintiff. Multiplication of the defendant's liability was an additional concern. The number of family members who might seek damages on the basis of a single incident could unreasonably enlarge the defendant's burden. We rejected a suggestion that principles enunciated in *Dillon* mandated recognition of the children's cause of action, noting what was then the *Dillon* limitation—that the *Dillon* plaintiff have suffered physical injury— which limited the class of potential plaintiffs. (19 Cal.3d at p. 450.)[8]

The court again recognized the need to limit recovery of monetary damages for intangible loss in *Turpin* v. *Sortini* (1982) 31 Cal.3d 220, 237 [182 Cal.Rptr. 337, 643 P.2d 954]. There, in an action for "wrongful life," the court limited damages to economic loss and observed that "a monetary award of general damages . . . cannot in any meaningful sense compensate the plaintiff."

---

[8] Similar concerns led the court to reject a parent's cause of action for loss of a child's consortium in a companion case. "Our opinion in *Borer* v. *American Airlines, supra,* [19 Cal.3d] 441, explains the policy considerations which impelled us to conclude that a child should not have a cause of action for loss of parental consortium. Those reasons for the most part apply fully to the present issue of a parental claim for loss of filial consortium. The intangible character of the loss, which can never really be compensated by money damages; the difficulty of measuring damages; the dangers of double recovery or multiple claims and of extensive liability—all these considerations apply similarly to both cases." (*Baxter* v. *Superior Court* (1977) 19 Cal.3d 461, 464 [138 Cal.Rptr. 315, 563 P.2d 871].)

*Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159, 165, footnote 6,[9] offers additional guidance, justifying what we acknowledge must be arbitrary lines to similarly limit the class of potential plaintiffs if emotional injury absent physical harm is to continue to be a recoverable item of damages in a negligence action. The impact of personally observing the injury-producing event in most, although concededly not all, cases distinguishes the plaintiff's resultant emotional distress from the emotion felt when one learns of the injury or death of a loved one from another, or observes pain and suffering but not the traumatic cause of the injury. Greater certainty and a more reasonable limit on the exposure to liability for negligent conduct is possible by limiting the right to recover for negligently caused emotional distress to plaintiffs who personally and contemporaneously perceive the injury-producing event and its traumatic consequences.

Similar reasoning justifies limiting recovery to persons closely related by blood or marriage since, in common experience, it is more likely that they will suffer a greater degree of emotional distress than a disinterested witness to negligently caused pain and suffering or death. Such limitations are indisputably arbitrary since it is foreseeable that in some cases unrelated persons have a relationship to the victim or are so affected by the traumatic event that they suffer equivalent emotional distress. As we have observed, however, drawing arbitrary lines is unavoidable if we are to limit liability and establish meaningful rules for application by litigants and lower courts.

No policy supports extension of the right to recover for NIED to a larger class of plaintiffs. Emotional distress is an intangible condition experienced by most persons, even absent negligence, at some time during their lives. Close relatives suffer serious, even debilitating, emotional reactions to the injury, death, serious illness, and evident suffering of loved ones. These reactions occur regardless of the cause of the loved one's illness, injury, or death. That relatives will have severe emotional distress is an unavoidable aspect of the "human condition." The emotional distress for which monetary damages may be recovered, however, ought not to be that form of acute emotional distress or the transient emotional reaction to the

---

[9]"[A] distinction between distress caused by personal observation of the injury and by hearing of the tragedy from another is justified because compensation should be limited to abnormal life experiences which cause emotional distress. While receiving news that a loved one has been injured or has died may cause emotional distress, it is the type of experience for which in a general way one is prepared, an experience which is common. By contrast few persons are forced to witness the death or injury of a loved one or to suddenly come upon the scene without warning in situations where tortious conduct is involved. In the present case, for example, while it is common to visit a loved one in a hospital and to be distressed by the loved one's pain and suffering, it is highly uncommon to witness the apparent neglect of the patient's immediate medical needs by medical personnel." (*Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159, 165, fn. 6.)

occasional gruesome or horrible incident to which every person may potentially be exposed in an industrial and sometimes violent society. ▇ Regardless of the depth of feeling or the resultant physical or mental illness that results from witnessing violent events, persons unrelated to those injured or killed may not now recover for such emotional upheaval even if negligently caused. Close relatives who witness the accidental injury or death of a loved one and suffer emotional trauma may not recover when the loved one's conduct was the cause of that emotional trauma. The overwhelming majority of "emotional distress" which we endure, therefore, is not compensable.

Unlike an award of damages for intentionally caused emotional distress which is punitive, the award for NIED simply reflects society's belief that a negligent actor bears some responsibility for the effect of his conduct on persons other than those who suffer physical injury. In identifying those persons and the circumstances in which the defendant will be held to redress the injury, it is appropriate to restrict recovery to those persons who will suffer an emotional impact beyond the impact that can be anticipated whenever one learns that a relative is injured, or dies, or the emotion felt by a "disinterested" witness. The class of potential plaintiffs should be limited to those who because of their relationship suffer the greatest emotional distress. When the right to recover is limited in this manner, the liability bears a reasonable relationship to the culpability of the negligent defendant.

The elements which justify and simultaneously limit an award of damages for emotional distress caused by awareness of the negligent infliction of injury to a close relative are those noted in *Ochoa*—the traumatic emotional effect on the plaintiff who contemporaneously observes both the event or conduct that causes serious injury to a close relative and the injury itself. Even if it is "foreseeable" that persons other than closely related percipient witnesses may suffer emotional distress, this fact does not justify the imposition of what threatens to become unlimited liability for emotional distress on a defendant whose conduct is simply negligent. Nor does such abstract "foreseeability" warrant continued reliance on the assumption that the limits of liability will become any clearer if lower courts are permitted to continue approaching the issue on a "case-to-case" basis some 20 years after *Dillon*.

(P)▇ We conclude, therefore, that a plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, said plaintiff: (1) is closely related to the injury

victim;[10] (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim;[11] and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances.[12] These factors were present in *Ochoa* and each of this court's prior decisions upholding recovery for NIED.

The dictum in *Ochoa* suggesting that the factors noted in the *Dillon* guidelines are not essential in determining whether a plaintiff is a foreseeable victim of defendant's negligence should not be relied on. The merely negligent actor does not owe a duty the law will recognize to make monetary amends to all persons who may have suffered emotional distress on viewing or learning about the injurious consequences of his conduct. To the extent they are inconsistent with this conclusion, *Nazaroff* v. *Superior Court, supra,* 80 Cal.App.3d 553, and *Archibald* v. *Braverman, supra,* 275 Cal.App.2d 253, are disapproved. Experience has shown that, contrary to the expectation of the *Dillon* majority, and with apology to Bernard Witkin, there are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for that injury.

---

[10] In most cases no justification exists for permitting recovery for NIED by persons who are only distantly related to the injury victim. Absent exceptional circumstances, recovery should be limited to relatives residing in the same household, or parents, siblings, children, and grandparents of the victim.

[11] Once the rhetoric of the dissent (*post,* p. 682) has been pierced, it is clear that the dissent, too, recognizes that foreseeability of injury cannot be the sole test of liability, and that the court must ultimately define the limits of liability. While not forthrightly acknowledging the inescapable necessity of limits that will in some cases seem arbitrary, the dissent (*post,* p. 688) itself suggests a different, but no less arbitrary, limit—that the plaintiff may recover if he or she witnesses the "immediate" consequences of the third party injury (Why stop there? Is that a less arbitrary line?). It is obvious, moreover, that the difficulty in defining the parameters of the line espoused by the dissent has been the cause of further arbitrariness in the irreconcilable rulings of trial courts and the conflicting appellate rulings on cases in which the factual differences offer little or no meaningful distinctions.

The dissent's suggestion that *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112-113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], should extend to actions for negligent infliction of emotional distress lacks support in our decisions. Neither *Rowland* v. *Christian* nor the other cases cited by the dissent (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799 [157 Cal.Rptr. 407, 598 P.2d 60]; *Sun'n Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671 [148 Cal.Rptr. 329, 582 P.2d 920]; *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 799 [123 Cal.Rptr. 468, 539 P.2d 36]) are cases in which damages for negligently inflicted emotional distress were in issue. Recovery for this type of damage, when no other injury is present, has never been subject only to the general principles of foreseeability applied in *Rowland* v. *Christian* that the dissent (*post,* pp. 686-687) would have us adopt here as the basis of liability.

[12] As explained by the Hawaii Supreme Court, "serious mental distress may be found where a reasonable [person] normally constituted, would be unable to adequately cope with the mental distress engendered by the circumstances of the case." (*Rodrigues* v. *State* (1970) 52 Hawaii 156, 173 [472 P.2d 509, 519-520].)

## VI

### Disposition

The undisputed facts establish that plaintiff was not present at the scene of the accident in which her son was injured. She did not observe defendant's conduct and was not aware that her son was being injured. She could not, therefore, establish a right to recover for the emotional distress she suffered when she subsequently learned of the accident and observed its consequences. The order granting summary judgment was proper.

The judgment of the Court of Appeal is reversed.

Each party shall bear its own costs on appeal.

Lucas, C. J., Panelli, J., and Arguelles, J.,* concurred.

**KAUFMAN, J.,** Concurring.—We granted review in this case because of the obvious and continuing difficulties that have plagued trial courts and litigants in the area of negligent infliction of emotional distress. Of course, any meaningful review of the issue necessarily entails reappraising, in the light of 20 years of experience, our landmark holding in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], that a plaintiff may recover for the emotional distress induced by the apprehension of negligently caused injury to a third person. Two such "reappraisals" have now been suggested.

The majority opinion by Justice Eagleson proposes to convert *Dillon*'s flexible "guidelines"[1] for determining whether the risk of emotional injury was foreseeable or within the defendant's duty of care, into strict "elements" necessary to recovery. While conceding that such a doctrinaire approach will necessarily lead to "arbitrary" results, Justice Eagleson nevertheless concludes that "[g]reater certainty and a more reasonable limit on the exposure to liability for negligent conduct" require strict limitations. (Maj. opn., p. 666.)

Justice Broussard, in dissent, opposes the effort to rigidify the *Dillon* guidelines. He urges, instead, that the court remain faithful to the guidelines

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1] *Dillon* set forth three factors which the courts should "take into account" in determining whether the injury was "foreseeable": (1) whether the plaintiff was "located near the scene of the accident," (2) whether the emotional distress resulted "from the sensory and contemporaneous observance of the accident," and (3) whether the plaintiff and the victim "were closely related. . . ." (68 Cal.2d at pp. 740-741.)

as originally conceived—as specific but "flexible" limitations on liability—and adhere to *Dillon*'s original reliance on "foreseeability as a general limit on tort liability." (Dis. opn. of Broussard, J., p. 685.) Justice Broussard denies that *Dillon* has failed to afford adequate guidance to the lower courts or to confine liability within reasonable limits. On the contrary, the *Dillon* approach, in the dissent's view, has provided—and continues to provide—a workable and *"principled* basis for determining liability. . . ." (*Id.* at p. 689, italics added.)[2]

With all due respect, I do not believe that either the majority opinion or the dissent has articulated a genuinely "principled" rule of law. On the one hand, experience has shown that rigid doctrinal limitations on bystander liability, such as that suggested by Justice Eagleson, result inevitably in disparate treatment of plaintiffs in substantially the same position. To be sure, the majority freely—one might say almost cheerfully —acknowledges that its position is arbitrary; yet nowhere does it consider the *cost* of such institutionalized caprice, not only to the individuals involved, but to the integrity of the judiciary as a whole.

On the other hand, two decades of adjudication under the inexact guidelines created by *Dillon* and touted by the dissent, has, if anything, created a body of case law marked by even greater confusion and inconsistency of result. (See Nolan and Ursin, *Negligent Infliction of Emotional Distress: Coherence Emerging from Chaos* (1982) 33 Hastings L.J. 583, 620 ["Arbitrary and unseemly results in emotional distress cases have been the consequence of this experimentation."].)

The situation, therefore, calls for a wholesale reappraisal of the wisdom of permitting recovery for emotional distress resulting from injury to others.

A. *Background*

The history of negligent infliction of emotional distress is a chronicle of "false starts." (*Nolan and Ursin, supra,* 33 Hastings L.J. at p. 604.) Initially, the courts were reluctant to allow any recovery for intangible harms such as fright or emotional distress resulting from negligent conduct. (Prosser and Keeton, The Law of Torts (5th ed. 1984) § 54, p. 360.) Later, plaintiffs were permitted to recover for the emotional distress occasioned by the fear for their own safety, but only when accompanied by physical impact. (Prosser

---

[2] Although Justice Mosk has penned a separate dissent, he expresses "general agreement" with Justice Broussard's views and adds nothing to the *Dillon* analysis apart from an interesting sidelight on the short but eventful life of *Amaya v. Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295 [29 Cal.Rptr. 33, 379 P.2d 513]. Accordingly, I have confined my critique to the majority opinion and the Broussard dissent.

and Keeton, *supra,* § 54, pp. 363-364; Comment, *Dillon Revisited: Toward A Better Paradigm for Bystander Cases* (1982) 43 Ohio St. L.J. 932, 933-934.)

The "impact" rule was soon recognized as inherently arbitrary, however, because of the obvious discontinuity between the rule's scope and its underlying purpose. As one commentator wryly observed, "[A] near miss may be as frightening as a direct hit." (Pearson, *Liability to Bystanders for Negligently Inflicted Emotional Harm—A Comment on the Nature of Arbitrary Rules* (1982) 34 U.Fla.L.Rev. 477, 488.)

Thus, the "impact" rule was eventually replaced by a rule allowing recovery for the emotional distress resulting from threats to the plaintiff's safety, regardless of physical impact, if the plaintiff was within the "zone of physical impact or danger." (See, e.g., *Battalla* v. *State* (1961) 10 N.Y.2d 257 [219 N.Y.S.2d 34, 176 N.E.2d 729]; *Waube* v. *Warrington* (1935) 216 Wis. 603 [258 N.W. 497]); Note, *Limiting Liability for the Negligent Infliction of Emotional Distress: The "Bystander Recovery" Cases* (1981) 54 So.Cal.L.Rev. 847, 849-850.) The seminal California decision rejecting the impact test in favor of the zone-of-danger rule is *Amaya* v. *Home, Ice, Fuel & Supply Co., supra,* 59 Cal.2d 295.

In reaffirming the zone-of-danger rule, the *Amaya* court rejected the argument that liability should be extended in favor of one who claims injury through fright or shock induced by negligent conduct directed not to *oneself* but to a *third person*. While acknowledging that emotional trauma induced by the apprehension of danger to a loved one was eminently "foreseeable," the *Amaya* court nevertheless refused to recognize that freedom from such distress constituted a legally protected interest. A number of policy reasons were cited by the *Amaya* court in support of its decision, including: the risk of fraudulent claims based upon such intangible "psychic" injuries; the threat of unlimited liability and the attendant economic strain on the insurance system; the disproportionality between the culpability of the negligent tortfeasor and the liability imposed; and the impossibility of formulating a "sensible or just stopping point." (59 Cal.2d at pp. 310-315.)

Only five years later, however, in *Dillon* v. *Legg, supra,* 68 Cal.2d 728, the court reversed field, rejecting *Amaya*'s zone-of-danger test as "hopelessly artificial" and recognizing for the first time in American jurisprudence the concept of "bystander" liability. In *Dillon,* the plaintiff's daughter was struck and killed by a car negligently driven by the defendant. Plaintiff, who observed the accident from an unspecified location, sought damages for the emotional distress resulting from the incident; plaintiff's other daughter, who was standing on the curb, also claimed emotional distress. The trial court sustained a motion for summary judgment as to the plaintiff, the

decedent's mother, on the ground that the pleadings failed to establish that she was within the zone of danger and feared for her own safety, but denied a similar motion as to the daughter because of the possibility that she was within such zone and feared for her own safety. (*Id.* at pp. 731-732.)

The *Dillon* court reversed, explaining its reasoning as follows: "[W]e can hardly justify relief to the sister for trauma which she suffered upon apprehension of the child's death and yet deny it to the mother merely because of a happenstance that the sister was some few yards closer to the accident. The instant case exposes the hopeless artificiality of the zone-of-danger rule." (68 Cal.2d at p. 733.) And so the *Dillon* court recognized the mother's right to recover for emotional distress caused by the apprehension of danger to her daughter; delineated its now-famous guidelines for determining foreseeability; and left to "future cases" the task of delimiting "bystander" liability "upon facts more subtle than the compelling ones alleged in the complaint before us." (*Id.* at p. 741.)

Of course, it was immediately apparent that the *Dillon* court's holding was not really based on any inherent flaw or "artificiality" in the zone-of-danger rule. As the *Dillon* dissent pointed out, that rule was designed to compensate for the emotional distress occasioned by the fear of physical impact solely "to oneself." (68 Cal.2d at p. 750, dis. opn. of Burke, J.) A rule which permitted such recovery to one within the zone of physical impact or danger was not arbitrary at all. (*Ibid.*) It became arbitrary only after the court recognized fear for the safety of others as a legally protected interest. (See *Pearson, supra,* 34 U.Fla.L.Rev. at pp. 490-491.) Indeed, as discussed below, the zone-of-danger rule remains a viable measure of emotional distress in many states where the bystander-recovery rule has been rejected as inherently arbitrary.

B. *Dillon Rejected as Hopelessly Arbitrary*

In light of the foregoing, it is perhaps not surprising to find that during the last 20 years *Dillon* has played to decidedly mixed reviews among our sister states. While many have adopted the *Dillon* approach or some variation thereon, many others have explicitly rejected "bystander" recovery and adopted in its place the "zone-of-danger" rule articulated in the very decision which *Dillon* overruled, *Amaya* v. *Home Ice Fuel & Supply Co., supra,* 59 Cal.2d 295. (See, e.g., *Rickey* v. *Chicago Transit Authority* (1983) 98 Ill.2d 546 [457 N.E.2d 1, 5]; *Towns* v. *Anderson* (1978) 195 Colo. 517 [579 P.2d 1163] and *James* v. *Harris* (Colo.App. 1986) 729 P.2d 986; *Guilmette* v. *Alexander* (1969) 128 Vt. 116 [259 A.2d 12] and *Vaillancourt* v. *Medical Ctr. Hosp. of Vt.* (1980) 139 Vt. 138 [425 A.2d 92]; *Whetham* v. *Bismarck Hospital* (N.D. 1972) 197 N.W.2d 678; *Stadler* v. *Cross* (Minn. 1980) 295

N.W.2d 552 and *Leaon* v. *Washington County* (Minn. 1986) 397 N.W.2d 867; *Grimsby* v. *Samson* (1975) 85 Wn.2d 52 [530 P.2d 291, 77 A.L.R.2d 436].) Indeed, despite the wide range of opinion on the subject of negligent infliction of emotional distress, several recent decisions have noted that the *majority* of jurisdictions where the question has been considered have rejected the *Dillon* approach in favor of the zone-of-danger rule. (See *Rickey* v. *Chicago Transit Authority, supra,* 475 N.E.2d at p. 5; *Gillman* v. *Burlington Northern R. Co.* (N.D.Ill. 1987) 673 F.Supp. 913, 917, fn. 1.)

While the courts rejecting bystander liability have cited a number of reasons, one argument in particular has been considered dispositive: *Dillon*'s confident prediction that future courts would be able to fix just and sensible boundaries on bystander liability has been found to be wholly illusory—both in theory and in practice.[3] (See, e.g., *Stadler* v. *Cross, supra,* 295 N.W.2d at p. 555 ["No arguments have been presented that persuade us that the problems we see in limiting liability once it is extended beyond the zone of danger of physical impact can be justly overcome."]; *Grimsby* v. *Samson, supra,* 530 P.2d at p. 294 ["(T)here appears to be no rational way to restrict the scope of liability even as attempted by *Dillon*'s three limiting standards."]; *James* v. *Harris, supra,* 729 P.2d at p. 988 [" 'Assuming that there are cogent reasons for extending liability in favor of victims of shock resulting from injury to others, there appears to be no rational way to limit the scope of liability.' "].)

As the New York Court of Appeals, writing one year after *Dillon,* presciently observed: "Every parent who loses a child or whose child . . . suffers an injury is likely to sustain grievous psychological trauma. . . . Any rule based . . . on eyewitnessing the accident could stand only until the first case comes along in which the parent is in the immediate vicinity but did not see the accident." (*Tobin* v. *Grossman, supra,* 249 N.E.2d at p. 423.) Of course, that case "came along" in California only one short year after *Dillon*. In *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253 [79 Cal.Rptr. 723], the court allowed recovery by a mother who "did not actually witness the tort but viewed the child's injuries within moments after the occurrence of the injury-producing event." (*Id.* at p. 255.) Similar cases have followed. In *Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553 [145 Cal.Rptr. 657], for example, the court reversed the entry of summary judgment in favor of the defendant, holding that a mother who

---

[3] Other factors frequently cited but not considered dispositive in light of the insurmountable problem of formulating just and sensible limitations on liability include the fear of a proliferation of claims, the potential for fraudulent claims, the disproportionality between fault and liability, and the undue burden on the insurance system. (See, e.g., *Stadler* v. *Cross, supra,* 295 N.W.2d at p. 555, fn. 3; *Tobin* v. *Grossman* (1969) 24 N.Y.2d 609 [249 N.E.2d 419, 422]; see also *Amaya* v. *Home Ice, Fuel & Supply Co., supra,* 59 Cal.2d at pp. 310-315.)

had witnessed her infant son being pulled from a pool minutes after drowning could state a claim for negligent infliction of emotional distress. In the very case now under review, the Court of Appeal reversed the entry of summary judgment in favor of defendants, the owners and driver of a car which struck the child of the plaintiff, Maria Thing, where the evidence showed that Maria did not see the impact but rushed to the scene in time to see her son lying in the street, bleeding, and rode in the ambulance that took him to the hospital for treatment of severe injuries.

Of course, not all interpretations of *Dillon* have been so liberal. In *Arauz v. Gerhardt* (1977) 68 Cal.App.3d 937 [137 Cal.Rptr. 619], for example, the court denied recovery to a mother who arrived at the scene of a car accident involving her child within five minutes of the event; the court noted that the plaintiff was "not at the scene of the accident at the time of the impact and [was] not near enough to the scene to have any sensory perception of the impact. . . ." (*Id.* at p. 949.) In *Hathaway v. Superior Court* (1980) 112 Cal.App.3d 728 [169 Cal.Rptr. 435], the court denied recovery to the parents of a child who was electrocuted while playing in a relative's yard as the parents relaxed inside. Though the plaintiffs arrived less than one minute after the accident and saw the child lying in a puddle, gagging and spitting up, the court held that *Dillon* precluded recovery because the infant "was no longer gripping the water cooler and receiving the electrical charge." (*Id.* at p. 736.)

Twenty-five years ago, this court posed a series of rhetorical questions concerning the guidelines later adopted in *Dillon*: "[H]ow soon is 'fairly contemporaneous?' What is the magic in the plaintiff's being 'present'? Is the shock any less immediate if the mother does not know of the accident until the injured child is brought home? And what if the plaintiff is present at the scene but is nevertheless unaware of the danger or injury to the third person until shortly after the accident has occurred . . . ?" (*Amaya v. Home Ice, Fuel & Supply Co., supra,* 59 Cal.2d at p. 313.) As the foregoing sampling of *Dillon*'s progeny vividly demonstrates, we are no closer to answers today than we were then. The questions, however, are no longer hypothetical—they are real: Is there any rational basis to infer that Mrs. Arauz was any less traumatized than Mrs. Dillon because she saw her bloody infant five minutes after it was struck by defendant's car? Was the Hathaways' suffering mitigated by the fact that they witnessed their child literally in death's throes, but failed to witness the precipitating event? Could it be argued that the emotional distress is even more traumatic, more foreseeable, for parents such as the Hathaways who fail to witness the accident and later blame themselves for allowing it to occur?

Clearly, to apply the *Dillon* guidelines strictly and deny recovery for emotional distress because the plaintiff was not a contemporaneous eyewit-

ness of the accident but viewed the immediate consequences, ill serves the policy of compensating foreseeable victims of emotional trauma. Yet once it is admitted that temporal and spatial limitations bear no rational relationship to the likelihood of psychic injury, it becomes impossible to define, as the *Amaya* court well understood, any "sensible or just stopping point." (59 Cal.2d at p. 311.) By what humane and principled standard might a court decide, as a matter of law, that witnessing the bloody and chaotic aftermath of an accident involving a loved one is compensable if viewed within 1 minute of impact but noncompensable after 15? or 30? Is the shock of standing by while others undertake frantic efforts to save the life of one's child any less real or foreseeable when it occurs in an ambulance or emergency room rather than at the "scene"?

Obviously, a "flexible" construction of the *Dillon* guidelines cannot, ultimately, avoid drawing arbitrary and irrational distinctions any more than a strict construction. Justice Burke was right when he observed of the *Dillon* guidelines, "Upon analysis, their seeming certainty evaporates into arbitrariness, and inexplicable distinctions appear." (*Dillon* v. *Legg, supra,* 68 Cal.2d at p. 749, dis. opn. of Burke, J.)

## C. *Dillon's Arbitrary Approach Should Be Overturned*

Of course, it could be argued that recovery—not rationality—is the essential thing; that ultimately justice is better served by arbitrarily denying recovery to some, than by absolutely denying recovery to all. I find this argument to be unpersuasive, however, for two reasons.

First, the cost of the institutionalized caprice which *Dillon* has wrought should not be underestimated. The foremost duty of the courts in a free society is the *principled* declaration of public norms. The legitimacy, prestige and effectiveness of the judiciary—the "least dangerous branch"—ultimately depend on public confidence in our unwavering commitment to this ideal. Any breakdown in principled decisionmaking, any rule for which no principled basis can be found and clearly articulated, subverts and discredits the institution as a whole.

It is not always easy, of course, to accommodate the desire for individual justice with the need for reasoned, well-grounded, general principles. We sacrifice the latter for the sake of the former, however, only at our peril. For the "power-base" of the courts, as noted above, is rather fragile; it consists of the perception of our role in the structure of American government as the voice of reason, and the faith that the laws we make today, we *ourselves* will be bound by tomorrow. Any "rule"—such as *Dillon*'s—which permits and even encourages judgments based not on universal standards but individual

expediency, erodes the public trust which we serve, and on which we ultimately depend.

There is a second reason, apart from the inherently corrosive effect of arbitrary rules, that points to the conclusion that "bystander" liability should not be retained. The interest in freedom from emotional distress caused by negligent injury to a third party is simply not, in my view, an interest which the law can or should protect. It is not that the interest is less than compelling. The suffering of a parent from the death or injury of a child is terribly poignant, and has always been so. (See *Tobin* v. *Grossman, supra,* 249 N.E.2d at p. 422.) It is the very universality of such injury, however, which renders it inherently unsuitable to legal protection. The observation of the New York Court of Appeals in this regard is particularly pertinent: "While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. . . . The risks of indirect harm from the loss or injury of loved ones is pervasive and inevitably realized at one time or another. Only a very small part of that risk is brought about by the culpable acts of others. This is the risk of living and bearing children. It is enough that the law establishes liability in favor of those directly or intentionally harmed." (*Id.* at p. 424.)

A final argument against overruling *Dillon* is, of course, the simple fact that it has been the law for 20 years. Stare decisis should not be lightly dismissed in any thoughtful reconsideration of the law. History and experience, however, are the final judge of whether a decision was right or wrong, whether it should be retained, modified or abandoned. In this case, history and experience have shown, as the *Amaya* court accurately predicted, that the quest for sensible and just limits on bystander liability is "an inherently fruitless one." (59 Cal.2d at p. 313.)

Adherence to precedent cannot justify the perpetuation of a policy ill-conceived in theory and unfair in practice. As Justice Harlan aptly observed: "[A] judicious reconsideration of precedent cannot be as threatening to public faith in the judiciary as continued adherence to a rule unjustified in reason, which produces different results for breaches of duty in situations that cannot be differentiated in policy. . . ." (*Moragne* v. *States Marine Lines, Inc.* (1970) 398 U.S. 375, 405 [26 L.Ed.2d 339, 359, 90 S.Ct. 1772].)

For the foregoing reasons, therefore, I would overrule *Dillon* v. *Legg, supra,* 68 Cal.2d 728, and reinstate *Amaya* v. *Home Ice, Fuel & Supply Co., supra,* 59 Cal.2d 295 as the law of this state. Since the plaintiff was indisputably not within the zone of danger and could not assert a claim for emotional distress as the result of fear for her *own* safety, she could not

establish a right to recover. Accordingly, I concur in the majority's conclusion that the order granting summary judgment in this case was proper.

**MOSK, J.,** Dissenting.—I am in general agreement with the dissent of Justice Broussard. I write separately to point out my other areas of disagreement with the majority opinion.

Although the majority do not forthrightly overrule *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], and replace it with *Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295 [29 Cal.Rptr. 33, 379 P.2d 513], their preference is evident. Some historical background may be of passing interest.

When *Amaya* came to this court, Justice Tobriner was required to recuse himself because he had written the opinion in that case for the Court of Appeal. Three active justices and a retired justice sitting pro tem. reached a contrary conclusion, with three active justices dissenting on the grounds urged below by Justice Tobriner. Thus when *Dillon* v. *Legg* arrived at the court several years later, it was inevitable that Justice Tobriner would write the opinion, this time for a majority of the full court.

My point is that had there been a full complement of justices on this court at the time, *Amaya* would have mirrored the rule that ultimately prevailed in *Dillon* v. *Legg.* It can be said, of course, that a court is a court, regardless of its permanent or temporary composition. I agree as a general proposition. However, the foregoing history is an explanation for the fortuitous and short life of *Amaya.*

Beginning with *State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330 [240 P.2d 282], a unanimous opinion written by Justice Traynor 37 years ago, the majority recite a monotonous inventory of cases with which they find fault.[1] For the past three decades apparently all the courts in tort cases have been out of step except the current majority.

*Krouse* v. *Graham* (1977) 19 Cal.3d 59 [137 Cal.Rptr. 863, 562 P.2d 1022], is high on their list as the source of the "roots of the uncertainty reflected by the instant case." Yet the facts in *Krouse* caused little controversy. Justice Richardson declared for a court unanimous on the point: "the *Dillon* requirement of 'sensory and contemporaneous observance of the accident' does not require a *visual* perception of the impact causing the death or injury. In the matter before us, although [the husband] did not see

---

[1] It is curious that the majority refer to the concerns of insurers (maj. opn. pp. 647, 655). No insurance carrier is a party to this action.

[his wife] struck by defendant's automobile, he fully perceived the fact that she had been so struck, for he knew her position an instant before the impact, observed defendant's vehicle approach her at a high speed on a collision course, and realized that defendant's car must have struck her. Clearly, under such circumstances [the husband] must be deemed a percipient witness to the impact causing [the wife's] catastrophic injuries." (*Id.* at p. 76.)

As Justice Richardson perceptively noted, *Dillon* called for sensory observance of the accident. That means all of the senses, not merely visual perception. The husband in *Krouse* was at the scene, heard the impact, and was himself seriously injured in the accident. How that case can be said to cause the "roots of uncertainty," complained of by the majority, is difficult to comprehend.

In *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253, 256 [79 Cal.Rptr. 723], the Court of Appeal held that "the shock sustained by the mother herein was 'contemporaneous' with the explosion so as to satisfy the 'observance' factor." Perhaps my colleagues would have interpreted the facts differently, but in view of the prevailing factual determination, I cannot perceive any rationale for the criticism of the majority.

The next criticism of the majority is directed to *Justus* v. *Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122]. Theirs is a strange comment, for in *Justus* the court found no liability. While the plaintiff was in the delivery room, he was shielded from observing the death of the fetus and did not learn the fact until told later by a physician. As we said, "he had been admitted to the theater but the drama was being played on a different stage." (*Id.* at p. 584.)

*Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553, 566 [145 Cal.Rptr. 657], a Court of Appeal case, merely followed the instruction in BAJI No. 12.83 (6th ed. 1977), and concluded there were triable issues of fact as to whether the "physical harm to the mother resulted from an emotional shock proximately caused by the direct emotional impact from the *contemporaneous observation* of the immediate consequences of the defendants' negligent act, which was the proximate cause of the injury and death of her son." (Italics added.)

Some big guns are leveled at *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518], but they miss the target because of misunderstanding the relevant facts in *Molien*. After giving the wife a physical examination defendant incorrectly and negligently diagnosed her as having syphilis. As a consequence she was

directed by the physician to require her husband to undergo physical tests to ascertain if he was the source of her purported infection. Those negligent acts by the physician as to both husband and wife were clearly physical in nature.

Why the majority seem to have some trouble with *Molien* limiting recovery to the "direct victim" of the doctor's negligence is perplexing. To assure that recovery could not be claimed by an indirect victim or a mere casual bystander, the *Molien* court very strictly limited recovery to only a person who was directly and physically affected by the defendant's negligence. In that instance it could be only the wife who was *physically* examined and the husband who was instructed to be *physically* examined. The court made it abundantly clear that "the alleged tortious conduct of defendant was directed to [the husband] as well as to his wife." (27 Cal.3d at p. 923.) Thus both were direct victims.

That the majority fail to understand *Molien* is underscored by their comment that the parties did not suffer physical injury. The brutal fact is that the defendant committed malpractice in negligently diagnosing the wife in a physical examination as having a serious venereal disease and in directing the husband to undergo a physical examination. I cannot be as casual as the majority in concluding there is no physical aspect to negligent examinations for syphilis. Not physical? Do they believe such examinations are conducted over the telephone?

While the majority choose some partial quotations from *Andalon* v. *Superior Court* (1984) 162 Cal.App.3d 600 [208 Cal.Rptr. 899], that suggest the court had difficulty with the *Molien* rule, the fact is that the court properly analyzed the rule and found the plaintiff there to have a *Molien* cause of action. As the court pointed out, the end and aim of "the transaction with Mrs. Molien *directly* implicated the interests of Mr. Molien. The injury was not merely derivative of an injury to his spouse, i.e., indirect. Both Mr. and Mrs. Molien's interests in harmonious relations with their spouses were impinged by the inherent influence of Kaiser's misbehavior." (*Id.* at p. 610, italics in original.)

The majority comment on *Newton* v. *Kaiser Foundation Hospitals* (1986) 184 Cal.App.3d 386 [228 Cal.Rptr. 890], is curious. That court clearly understood that "the doctor-patient relationship with the wife directly implicated the interest of the husband: in *Molien,* misdiagnosis of a venereal disease directly implicated the sexual component of the marriage in which Mr. Molien obviously had an interest . . . ." (*Id.* at pp. 391-392.) The *Newton* court properly observed that the task of distinguishing bystanders

from direct victims is the task of lower courts. It found a cause of action under *Molien, supra,* 27 Cal.3d 916, had been stated.

The majority next offer lengthy criticism of *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159 [216 Cal.Rptr. 661, 703 P.2d 1]. *Ochoa* understood *Molien* clearly: "In *Molien* defendant's misdiagnosis was, by its very nature directed at both the wife and the husband." (*Id.* at p. 172.) However, the *Ochoa* court found in that case "the duty was owed to [the child's mother] as a percipient witness, not as a direct victim of negligence." (*Id.* at p. 173.) Such a holding was consistent with *Dillon's* requirements, *supra,* 68 Cal.2d 728.

Finally, the majority recite a card catalogue list of law review articles and broadly label them "critical" of the foregoing opinions. A careful reading of many of the articles fails to confirm that characterization.

For example, the note in (1983) 18 U.S.F. L.Rev. 145, pointed out that some commentators completely misunderstood the *Molien* case. Yet the answer was simple: "It is clear that a plaintiff should be classified as a direct victim rather than a bystander if he or she was the one toward whom the negligent conduct was directed." (*Id.* at p. 166.)

And the note in (1981) 33 Hastings L.J. 291, 312, declared that "The *Molien* rule involves nothing more than a return to basic tort principles."

Nolan and Ursin in (1982) 33 Hastings L.J. 583, appropriately titled their article *Negligent Infliction of Emotional Distress: Coherence Emerging from Chaos.* They wrote: "*Molien* convincingly demonstrates the superiority of seriousness, in comparison with the requirement of physical injury, as a safeguard against fraudulent claims in emotional distress cases." (*Id.* at p. 610.)

The note in (1982) 18 Cal. Western L.Rev. 101, is hardly critical of the opinions of this court with which the majority now find fault. Said the author: "The court in *Molien* emphasized the fact that the plaintiff, Mr. Molien, was 'himself a direct victim of the admittedly negligent act'—that is, Mr. Molien was required to undergo blood tests to determine whether he had contracted syphilis. The court contrasted that fact pattern with the 'bystander scenario' which applied to the *Dillon* facts." (*Id.* at p. 112, fns. omitted.)

Some of the articles in the majority's card index list not only support *Dillon, supra,* 68 Cal.2d 728, but recommend an expansion. For example, the test proposed in (1981) 54 So.Cal.L.Rev. 847, 867, is to allow "recovery

for those types of emotional distress for which a reasonable person would be emotionally unprepared."

The note, *Dillon Revisited* (1982) 43 Ohio St. L.J. 931, 940, contains a thoughtful discussion of psychological distress: "When first announced the requirement of physical manifestation was a proper limitation. It verified the severity of the emotional distress when medical science had not yet achieved sufficient sophistication to accomplish the task. With a better understanding of emotional responses, this need to show physical manifestation should diminish. The secondary responses basically are capable of objective verification. Thus, consistent with *Molien,* the issue should be one of proof that utilizes objective criteria.

"Once the court acknowledges that the issue is one of proof of emotional distress, it then must determine the type or degree of emotional distress that the law will recognize. *Molien* held that 'some guarantee of genuineness' of the evidence given should be required to sustain a claim. The court, however, was addressing only the issue of the evidence necessary to avoid a demurrer. Courts must set a standard that allows the fact finder to distinguish between compensable and noncompensable emotional distress.

"The *Restatement (Second) of Torts* [§ 46, com. j] suggests a possible starting point to begin this analysis. The following comment attempts to define actionable emotional distress:

" 'It is only when it is extreme that liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is part of the price of living among people. The law intervenes only when the distress is *so severe that no reasonable man could be expected to endure it.*' " (Italics in original, fns. omitted.)

In short, the majority's broad generalization that commentators have been critical of the tort opinions of this court is unsupported when one goes beyond a superficial glance at the cited articles. For the most part, the authors understandably purported to distill the rules that should be applied to future fact situations. Some of their conclusions were sound, others dubious. That, of course, is not inconsistent with the function of law reviews: to stimulate legal thought.

I disagree with the majority opinion not merely for its conclusion—although I concur with Justice Broussard in that respect—but with its wholesale criticism of past opinions of this court and of the Courts of Appeal, some prevailing for three decades. Such callous disregard for the doctrine of stare decisis does not constructively serve the judicial process, nor does it

contribute to the guidance of the bench and bar. As Justice Cardozo wrote in The Nature of the Judicial Process (1921) page 34, "Adherence to precedent must . . . be the rule rather than the exception if litigants are to have faith in the even-handed administration of justice in the courts."

**BROUSSARD, J.**—I dissent.

"[T]he problem [of negligent infliction of emotional distress] should be solved by the application of the principles of tort, not by the creation of exceptions to them. Legal history shows that artificial islands of exceptions, created from the fear that the legal process will not work, usually do not withstand the waves of reality and, in time, descend into oblivion." (*Dillon v. Legg* (1968) 68 Cal.2d 728, 747 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] [Tobriner, J., admonishing this court not to do what the majority do today].)

The majority grope for a "bright line" rule for negligent infliction of emotional distress actions, only to grasp an admittedly arbitrary line which will deny recovery to victims whose injuries from the negligent acts of others are very real. In so doing, the majority reveal a myopic reading of *Dillon v. Legg, supra,* 68 Cal.2d 728. They impose a strict requirement that plaintiff be present at the scene of the injury-producing event at the time it occurs and is aware that it is causing injury to the victim. This strict requirement rigidifies what *Dillon* forcefully told us should be a flexible rule, and will lead to arbitrary results. I would follow the mandate of *Dillon* and maintain that forseeability and duty determine liability, with a view toward a policy favoring reasonable limitations on liability. There is no reason why these general rules of tort law should not apply to negligent infliction of emotional distress actions.

## I.

We held in *Dillon* that a mother who witnesses the negligent infliction of death or injury on her child may recover for the resulting emotional distress even though the mother does not fear imminent physical harm. We recognized that the primary consideration in finding liability was foreseeability (*Dillon, supra,* 68 Cal.2d at pp. 730-740) and rejected the "hopeless artificiality" of the zone-of-danger rule. (*Id.* at p. 733.)

The majority themselves note that "foreseeability of the injury [is] the basis of a negligent actor's duty," (maj. opn. at p. 654) and quote from *Dillon* that this issue must necessarily be adjudicated only upon "a case-by-case basis." (Maj. opn. at p. 655, quoting *Dillon, supra,* 68 Cal.2d at p. 741.) " 'We cannot now predetermine defendant's obligation in every situation by

a fixed category; *no immutable rule* can establish the extent of that obligation for every circumstance of the future.' " (Maj. opn. at p. 654, quoting *Dillon, supra,* 68 Cal.2d at p. 740, italics added.)

Though *Dillon* made foreseeability its lodestar, it provided three factors for courts to consider in determining whether a negligent infliction of emotional distress cause of action was stated in a particular case: "(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (*Dillon, supra,* 68 Cal.2d at pp. 740-741.)

*Dillon* denounced "artificial abstractions which bar recovery contrary to the general rules" of tort law, and emphasized that " 'mechanical rules of thumb which are at variance with these principles do more harm than good.' [Citation.]" (68 Cal.2d at pp. 746-747.) However, some courts have rigidly and mechanically applied the *Dillon* guidelines—many times at the cost of injustice to a victim of a tortfeasor's negligent act. Professor Diamond, although quoted extensively by the majority, warned against a strict application of the *Dillon* guidelines: "[C]ourts have applied the *Dillon* guidelines mechanically, viewing them as strict preconditions to recovery. This mechanical application has led to the erection of arbitrary limitations on recovery bearing little relation to the principles of foreseeability espoused so forcefully in *Dillon*. While in some instances mental distress is compensated, other equally foreseeable mental injuries are not. The result is feast or famine for the plaintiff depending on the fortuities of time, location, or characterization of the plaintiff as 'direct' or 'indirect.' " (Diamond, *Dillon v. Legg Revisited: Toward a Unified Theory of Compensating Bystanders and Relatives for Intangible Injuries* (1984) 35 Hastings L.J. 477, 477-478.)

The majority ignore the fundamental mandate of *Dillon* to consider foreseeability and duty in finding liability. Their only justification for this and a strict rule that will limit liability at the cost of arbitrary results is an amorphous "policy" one. They ironically use the term "amorphous" to describe the concepts of foreseeability and duty and state that "[i]n the present context, however, we are concerned *not* with whether an injury is 'foreseeable' as a result of the negligent conduct. . . . [T]he court's role in deciding whether a 'duty' to these persons should be recognized *does not depend* solely on the 'foreseeability' of the emotional distress, but on these policy considerations." (Maj. opn. at p. 654, fn. 3, italics added.) "[I]t is clear that

foreseeability of the injury alone is *not* a useful 'guideline' or a meaningful restriction on the scope of the NIED action. . . . [¶] [P]olicy considerations justify restrictions on recovery for emotional distress notwithstanding the sometimes *arbitrary result,* and that the court has an obligation to establish those restrictions." (Maj. opn. at pp. 663-664, italics added.) The majority admit their "policy" reasons are only a balance of "arbitrary lines which deny recovery to some victims whose injury is very real against that of imposing liability out of proportion to culpability for negligent acts," with a view to the "administration of justice of clear guidelines." (*Id.* at p. 664.)

For these reasons, the majority impose the strict requirement that plaintiff be present at the scene of the injury producing event at the time it occurs and is then aware that it is causing injury to the victim.[1] They freely admit to "drawing arbitrary lines" but complain that it is "unavoidable if we are to limit liability and establish meaningful rules for application by litigants and lower courts." (Maj. opn. at p. 666.) Thus what in *Dillon* were guidelines to assist courts in assessing liability become a tripartite test, which includes the above-mentioned strict and arbitrary requirement, and displaces the consideration of foreseeability.

Under the majority's strict requirement, a mother who arrives moments after an accident caused by another's negligence will not be permitted recovery. No matter that the mother would see her six-year-old son immediately after he was electrocuted, lying in a puddle of water in a dying state, gagging and choking in his own vomit, as in *Hathaway* v. *Superior Court* (1980) 112 Cal.App.3d 728 [169 Cal.Rptr. 435]. No matter that the mother would be following her daughters' car and would come upon the wreckage of the car "before the dust had settled" to find the mangled bodies of her daughters, who were dead or dying, as in *Parsons* v. *Superior Court* (1978) 81 Cal.App.3d 506, 509 [146 Cal.Rptr. 495].

The answer to the question of how this court should limit liability does not lie in the majority's rigid application of *Dillon* and the toleration of arbitrary results that will flow therefrom. As the Wyoming Supreme Court suggested, in *Gates* v. *Richardson* (Wyo. 1986) 719 P.2d 193, the nature of the shock to be compensated requires a realistic approach to the contempo-

---

[1] The majority declare "that a plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (Maj. opn. at pp. 667-668, fns. omitted.)

raneous-perception factor: "It is more than the shock one suffers when he learns of the death or injury of a child, sibling or parent over the phone, from a witness, or at the hospital. It is more than bad news. The kind of shock the tort requires is the result of the immediate aftermath of an accident. It may be the crushed body, the bleeding, the cries of pain, and in some cases, the dying words which are really a continuation of the event. The immediate aftermath may be more shocking than the actual impact. . . ." (*Gates, supra,* at p. 199; see also *Dziokonski v. Babineau* (1978) 375 Mass. 555 [380 N.E.2d 1295, 1302]; Comment, *Dillon Revisited: Toward a Better Paradigm for Bystander Cases* (1982) 43 Ohio St. L.J. 931, 948.) The court there held that a close relative generally should be permitted recovery if she "observed the serious bodily harm or death shortly after its occurrence but without material change in the condition and location of the victim." (*Gates, supra,* 719 P.2d at p. 199; see also *Portee v. Jaffee* (1980) 84 N.J. 88 [417 A.2d 521] [recovery allowed to mother who arrived minutes after her son became wedged in an elevator shaft and was present and listened to his moans and cries during the futile four-and-one-half-hour struggle to free him before he died].)

The majority's strict requirement does not simply comprise a "bright line" rule that rationally limits liability. It is arbitrary and will lead to unjust results. *Dillon* condemned the "hopeless artificiality" that the majority propounds, and decried the "artificial abstractions which bar recovery contrary to the general rules" of tort law. The requirement is exactly the "mechanical rules of thumb" that *Dillon* explicitly admonished us not to create. We should follow *Dillon* and its progeny and maintain the rational and traditional rule that reasonable foreseeability is the basis for determining liability. (68 Cal.2d at p. 740.) "In order to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant at the time were *reasonably forseeable*." (*Id.* at p. 739, italics added.) As *Dillon* instructed, there is "no good reason why the general rules of tort law, including the concepts of negligence, proximate cause, and foreseeability, long applied to all other types of injury, should not govern the case now before us." (*Id.* at p. 746.) *Dillon*'s test of reasonable foreseeability "facilitates rational risk spreading and correlates liability with the risks that the defendant should expect." (Diamond, *supra,* 35 Hastings L.J. at p. 500.)

## II.

Of course I share the majority's policy concern that tortfeasors not face *unlimited* liability for their negligent acts. As stated above, the *Dillon* court recognized foreseeability as a general limit on tort liability. The court stated that the purpose of the three guidelines was actually to *limit* a defendant's

liability to "injuries to others which to defendant at the time were reasonably foreseeable." (*Dillon, supra,* 68 Cal.2d at p. 739; see Rabin, *Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment* (1985) 37 Stan.L.Rev. 1513, 1524-1526.)

Although I disagree with the majority's method of placing undue and what appears to be almost total reliance on a policy rationale, the *Dillon* guidelines also attempt to implement public policy in favor of reasonable limitations on liability. (See *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159, 180-181 [216 Cal.Rptr. 661, 703 P.2d 1] (Grodin, J., conc.); see also Pearson, *Liability to Bystanders for Negligently Inflicted Emotional Harm—A Comment on the Nature of Arbitrary Rules* (1982) 34 U.Fla.L.Rev. 477, 505-506.) The *Dillon* court did not intend the guidelines to be exclusive (68 Cal.2d at p. 740), and it specifically reserved the question of "whether, in the absence or reduced weight of some of the [three listed] factors, we would conclude that the accident and injury were not reasonably foreseeable and that therefore defendant owed no duty of care to plaintiff." (*Id.* at p. 741).

To determine whether defendants owed plaintiff a duty of care in this case, I think it is fruitful to reexamine the second *Dillon* guideline in light of *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], our leading case defining a defendant's duty of care. In *Rowland,* decided just two months after *Dillon,* we held that in the absence of a statutory exception to the legislative mandate that all persons are liable for injuries caused by failure to exercise due care (Civ. Code, § 1714, subd. (a)), "no such exception should be made unless clearly supported by public policy. [Citations.] [¶] A departure from this fundamental principle involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland, supra,* 69 Cal.2d at pp. 112-113; see also *Sun'n Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671, 695 [148 Cal.Rptr. 329, 582 P.2d 920]; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434-435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].)

While our cases defining a bystander's cause of action for negligent infliction of emotional distress consistently emphasize the first of the *Row-*

*land* factors—foreseeability of harm to plaintiff—discussion of the others has been limited. The second, fourth, and fifth factors may be disposed of quickly: certainty of injury is usually a jury question, particularly since we no longer require physical manifestations of mental distress (*Hedlund* v. *Superior Court* (1983) 34 Cal.3d 695, 706, fn. 8 [194 Cal.Rptr. 805, 669 P.2d 41, 41 A.L.R.4th 1063]); moral blame almost always militates in favor of recovery; and the policy of preventing future harm favors the plaintiff, but only slightly since, in most cases, any *Dillon* claim is simply added to the primary victim's complaint. The third, sixth and seventh factors, however, merit more discussion.

This court has emphasized the importance of the third *Rowland* factor—nexus between defendant's conduct and the risk of injury—in establishing limitations on recovery. In *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 808 [157 Cal.Rptr. 407, 598 P.2d 60], we stated that case law "place[s] a limit on recovery by focusing judicial attention on the foreseeability of the injury and the nexus between the defendant's conduct and the plaintiff's injury." There, we limited recovery for the tort of negligent interference with economic advantage "to instances where the *risk of harm is* foreseeable and is *closely connected with the defendant's conduct,* where damages are not wholly speculative and the injury is not part of the plaintiff's ordinary business risk." (*Ibid.*, italics added.)

The sixth and seventh *Rowland* factors—the burden on the defendant and the community, and the cost and availability of insurance—also merit further evaluation. Amici curiae[2] contend that recovery in this case would mark an unwarranted expansion of *Dillon,* resulting in a new category of plaintiffs, fewer settlements, higher administrative costs and premiums, delays in payment, increased litigation, and higher awards. Amici insist that *Dillon*'s second guideline should be applied strictly, as a prerequisite for recovery. Apparently they have convinced the majority since the majority approvingly quote the reasoning in *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441, 447 [138 Cal.Rptr. 302, 563 P.2d 858]: "We reasoned that we could not 'ignore the social burden of providing damages . . . merely because the money to pay such awards comes initially from the "negligent" defendant or his insurer. Realistically the burden . . . must be borne by the public generally in increased insurance premiums or, otherwise, in the enhanced danger that accrues from the greater number of people who may choose to go without any insurance. We must also take into account the cost of administration of a system to determine and pay [the] awards; . . .'" (Maj. opn. at p. 665.)

---

[2] Their brief was submitted by the National Association of Independent Insurers, the Association of California Insurance Companies, and the American Insurance Association.

The authorities upon which amici rely do not persuade me that *Dillon* has significantly contributed to any substantial increase in litigation and insurance premiums. Nor do I find any indication that other jurisdictions are retreating from *Dillon* (see 4 Speiser et al., The American Law of Torts (1987) §§ 16:25-16:26, pp. 1119-1126, and cases cited; Prosser & Keaton, Torts (5th ed. 1984) ch. 9, p. 366 et seq., and cases cited). As the *Dillon* court responded to the contention that otherwise meritorious claims should be barred out of fear of increases in the number of suits and of fraudulent claims: " ' "[We] should be sorry to adopt a rule which would bar all such claims on grounds of policy alone, and in order to prevent the possible success of unrighteous or groundless actions. Such a course involves the denial of redress in meritorious cases, and it necessarily implies a certain degree of distrust, which [we] do not share, in the capacity of legal tribunals to get at the truth in this class of claim." ' " (*Dillon, supra,* 68 Cal.2d at p. 744, quoting *Hambrook* v. *Stokes Bros.* (1925) 1 K.B. 141, quoting *Dulieu* v. *White and Sons* (1901) 2 K.B. 669, 681, opn. by Kennedy, J.; see also *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 928-929 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518].)

I also do not believe courts lack the means to prevent unmeritorious cases from going to trial. As the case at bar demonstrates, trial courts are well aware of their duty to determine before trial whether the defendant could have owed the plaintiff a duty of care under the facts. (See BAJI No. 12.84 (1986).)

### III.

As for the instant case, I agree with Justice Benke of the Court of Appeal who in her concurring opinion indicated that the plaintiff mother's claim should be permitted because "[u]nder current law, it cannot be said [plaintiff] is to be denied recovery because she did not see, hear or otherwise perceive the *actual* accident or injury. Case law permits the cause of action if she witnessed the immediate consequences of the event itself. It is a question of fact whether she did, and hence I would reverse the judgment below." (Italics added.) Justice Benke declined to take a more liberal standard that "would extend liability far beyond existing limitations." Her view is consistent both with *Rowland, supra,* 69 Cal.2d 108, and with the balance struck in *Dillon, supra,* 68 Cal.2d 728, between compensating legitimate claims and limiting liability.

I would conclude that the competing considerations cited in *Rowland,* (see *ante,* p. 686) as applied to this particular *Dillon* cause of action by the mother who sensorily perceived the immediate consequences of an accident involving her son, does not justify a departure from this state's fundamental

principle that a person is liable for injuries caused by his failure to exercise reasonable care under the circumstances. (Civ. Code, § 1714.) The majority's strict requirement that plaintiff be present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim will only bring about arbitrary results that will frustrate justice for victims of the negligent acts of others. We should apply the concepts of foreseeability and duty to negligent infliction of emotional distress actions, with a view toward a policy favoring reasonable restrictions on liability. This is a principled basis for determining liability and would also conform this area with other areas of negligence law.

The majority charge that, as former Supreme Court Justice Potter Stewart once said about obscenity, the *Dillon* guidelines mistakenly assumed that a court would know "duty" when it saw it. But more appropriate to the majority's opinion and the arbitrary and unjust results it will soon engender is what Potter Stewart said, very simply, upon being appointed to the United States Supreme Court: "Fairness is what justice really is." (*The Young Justice* (Oct. 20, 1958) Time, at p. 24.)