Filed 02/10/23

## STATE OF VERMONT

**SUPERIOR COURT**
**ADDISON UNIT**

**CIVIL DIVISION**
**Docket No. 12-2-19 Ancv**

**Jennifer Zeno-Ethridge and**
**Dennis Ethridge,**
    **Plaintiffs,**

    **v.**

**Comcast Corporation,**
**Comcast of CT/GA/MA/NH/NY/NC/VA/VT, LLC,**
**Eustis Cable Enterprises, LTD,**
**Green Mountain Flagging, LLC, and**
**Green Mtn. Concert Services, Inc. d/b/a Green Mountain Flagging,**
    **Defendants.**

### Decision on Defendants' Motions for Summary Judgment

Plaintiff Jennifer Zeno-Ethridge was a passing motorist who saw a dangerous situation develop at a work site on the shoulder of the highway and stopped to try to prevent harm. She witnessed a horrific scene of death and seeks recovery for emotional distress damages on two grounds: negligent infliction of emotional distress, and negligence. Her husband Plaintiff Dennis Ethridge was not present during the incident but seeks damages based on loss of consortium.

Defendants Comcast Corporation and Comcast of CT/GA/MA/NH/NY/NC/VA/VT, LLC (collectively "Comcast"), and Eustis Cable Enterprises, LTD ("Eustis") filed a Motion for Summary Judgment. Defendants Green Mountain Flagging, LLC, and Green Mtn. Concert Services, Inc. d/b/a Green Mountain Flagging, filed a companion Motion for Summary Judgment in which they incorporate all the facts and arguments presented by Comcast and Eustis. The court has reviewed the Motions, Plaintiffs' Opposition, Defendants' Replies, and Plaintiffs' Surreply.

Summary judgment may be granted on a claim if there is no dispute as to any material fact and the facts support judgment as a matter of law. The non-moving party receives the benefits of all reasonable doubts and inferences.

### Undisputed Material Facts

Although there are some disputes as to minor details, the material facts of the incident as they relate to required elements of each cause of action are undisputed.

On March 11, 2016, Ms. Zeno-Ethridge was driving south on Route 7 near the intersection of Route 125 with Route 7. She was following several car lengths behind a large tractor trailer. A Eustis utility truck was parked on the right shoulder, also facing southbound.

1

The Eustis truck and employees were there to perform cable installation work on behalf of Comcast pursuant to contract, and flaggers were also there working pursuant to contract. Comcast had obtained a State Highway and Access Work Permit for such work. Cones had been placed alongside the utility truck to direct southbound traffic away from the truck to avoid the work zone. The tractor trailer in front of Ms. Zeno-Ethridge moved to the left of the cones, and she started to do the same as she approached the work zone area. Her left wheels were on the centerline of Route 7 although she was still in the southbound lane.

As she made this movement, she looked over in the direction of the Eustis truck and saw Lawrence Kaminski, a flagger, standing at the rear of the truck on the passenger side. Then she saw that the truck was backing up, and she saw Mr. Kaminski get pulled down and sucked underneath the truck. She immediately pulled her vehicle over behind the Eustis truck and stopped it a car length behind the truck to stop the truck from continuing to back up. She was concerned that Mr. Kaminski was under the truck and might have an arm or leg pinned down by it and wanted to act to prevent injury to him. She is not sure at exactly what moment the truck stopped backing up, but when she stopped and put her car in park it was not backing toward her and she was not in danger herself. She was there to help and prevent harm to others.

She got out of her car and ran forward along the side of the truck toward the driver's door, initially waving her arms and shouting in order to warn the driver of the situation. As she moved forward, she saw the crushed skull and mutilated body of Mr. Kaminski under the truck close to the rear axle. She realized the horror of what had happened to Mr. Kaminski and that he was dead. She continued on to the driver's door. There was what turned out to be brain matter and body parts and blood from Mr. Kaminski on the ground. She walked on it on her way toward the front of the truck, and some got on the bottoms of her shoes and some splattered on her pants as she walked. When she reached the front of the truck, the driver had opened the door and was starting to get out. She pushed him back, and said 'you don't want to see this.'

She then ran back to her car to get a blanket. On her way she encountered a flagger, who called 911. She took from her trunk a blanket that her grandmother had made and returned to Mr. Kaminski's body to cover it with the blanket. She then got back into her own car, and cried.

In August of 2016, she was diagnosed with PTSD and depression which she attributes to this incident. In 2008, she had been treated for depression for a period following her breakup with her first husband. There is no evidence of a depression condition in the period preceding the incident.

### Analysis

All Defendants seek summary judgment as a matter of law on all three of the claims: negligent infliction of emotional distress, negligence, and loss of consortium. While there are some issues about which there are disputes of material fact (breach of duty, causation), the court concludes below that based on the undisputed facts and applicable law, Plaintiffs are unable to prove all elements of their causes of action. Therefore, summary judgment is granted to the Defendants.

## Negligent infliction of emotional distress

The cause of action of negligent infliction of emotional distress (NIED) allows a party to recover for emotional harms. Vermont law permits recovery for NIED under two circumstances: if a plaintiff endured a 'physical impact' during the incident that resulted in emotional distress, or if the plaintiff was within the 'zone of danger.' The case of *Brueckner v. Norwich University* sets forth the legal standards for this cause of action.

> To establish a claim for negligent infliction of emotional distress, a plaintiff must make a threshold showing that he or someone close to him faced physical peril. See *Francis v. Gaylord Container Corp*, 837 F. Supp.858, 864 (S.D. Ohio 1992)., *aff'd*, 9 F.3d 107 (6th Cir. 1993). The prerequisites for establishing a claim differ according to whether plaintiff suffered a physical impact from an external force. See *Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.*, 792 F.Supp. 1566, 1576–77 (S.D. Fla. 1992). If there has been an impact, plaintiff may recover for emotional distress stemming from the incident during which the impact occurred. See *id*. If plaintiff has not suffered an impact, plaintiff must show that: (1) he was within the "zone of danger" of an act negligently directed at him by defendant, (2) he was subjected to a reasonable fear of immediate personal injury, and (3) he in fact suffered substantial bodily injury or illness as a result. See *Vaillancourt v. Medical Ctr. Hosp. of Vermont*, 139 Vt. 138, 143, 425 A.2d 92, 95 (1980).

*Brueckner v. Norwich Univ.*, 169 Vt. 118, 125 (1999).

### *Physical impact test*

The parties dispute whether there was physical impact to Ms. Zeno-Ethridge as a result of her involvement. She experienced no impact from the truck, and Defendants note that there is no evidence that any body parts or brain matter from Mr. Kaminski ever touched her body, as opposed to her shoes or pants, or caused any injury to her body. Plaintiff argues that the bar for physical impact is low and that 'impact' should not be limited to physical contact but should include other consequences arising from the incident such as physical manifestations of PTSD.

The passage from the *Brueckner* decision set forth above is specific that "physical impact" is what differentiates the 'impact' basis for an NIED claim from the 'zone of danger' basis. The latter has specific requirements for recovery of emotional distress damages if there has been no physical impact during the incident.

The court in the *Kingston Square* case cited in *Brueckner* emphasized the importance, where the claim is based on physical impact, of "physical impact from an external force," and that "recovery is permitted for emotional distress stemming from the incident *during which the impact occurred. . ." Kingston Square*, 792 F.Supp. at 1576-1577 (emphasis added). The court made a clear distinction between a claim based on physical impact and the alternative basis for an NIED recovery "if the Plaintiff has not suffered an impact. . ." *Id*.

3

The issue then becomes whether Ms. Zeno-Ethridge experienced a physical impact during the incident described above. The undisputed facts show that no physical contact with Ms. Zeno-Ethridge's body occurred during the incident. There is no question that the truck backing up never touched her. The contact between the truck and Mr. Kaminski was disastrous, and resulted in material from his body becoming strewn on the ground. There is no evidence of any of the material making direct contact with Ms. Zeno-Ethridge before it landed on the ground, after which she walked across it on her way toward the front of the truck.

Plaintiff cites cases from other jurisdictions in support of the claim that Ms. Zeno-Ethridge experienced physical contact through her shoes and pants and urges the court to adopt a broad interpretation of physical impact. *Brueckner* established the standard for Vermont that as a matter of law, a plaintiff must experience physical bodily contact during the incident, even though courts in other states have established different standards. However, even in cases relied on by Plaintiff, there was physical contact: in one a gun touched the Plaintiff's head during a robbery, and in another a repair person was stabbed in the hand by a discarded hypodermic needle. Pls.' Opp'n to Defs.' Mot. for Summ. J. at 8.(filed June 10, 2022).

The court declines to conclude that material lying on the ground that comes in contact with the bottoms of a walker's shoes, and/or splatters on pants when the material is walked over in the aftermath of an incident, equates to the kind of "physical impact from an external force" that is the standard for the 'physical impact' test necessary for an NIED claim. Such a conclusion could potentially support recovery in cases in which ashes from a fire or particles from an explosion that are lying on the ground and walked upon later could be claimed as 'physical impact.'

Walking through shocking debris in the aftermath of a disastrous event can no doubt evoke a strong emotional reaction that has real effects, but under the current state of the law in Vermont, it does not meet the standard for a cause of action that requires physical contact with the body during the event. Thus, the facts do not support a NIED claim under the 'physical impact' test.

*Zone of danger test*

As noted in the quoted paragraph from *Brueckner* above, to recover under the 'zone of danger' test, a plaintiff must show that: (1) she was within the "zone of danger" of an act negligently directed at her by defendant, (2) she was subjected to a reasonable fear of immediate personal injury, and (3) she in fact suffered substantial bodily injury or illness as a result. The Vermont Supreme Court affirmed these requirements in 2013 as the general rule in Vermont in *Vincent v. DeVries*, 2013 VT 34, ¶ 12.

The first element requires a showing that Ms. Zeno-Ethridge was within the zone of danger of an act negligently directed at her by defendant. The facts cannot support a finding that an act of negligence was directed *at her*. She was a motorist passing by a work site by the side of the road. While Defendants had a duty not to do work in a manner that endangered passing

4

motorists, no act of negligence was directed toward passing motorists. Any negligence, if there was any, was confined to the area behind where the Eustis truck was initially parked. When Ms. Zeno-Ethridge saw a situation developing in which someone might get hurt, she generously and compassionately intervened to try to prevent or minimize harm, but that does not mean that she was within the area likely to be impacted by negligence of the type and scope alleged to have occurred.[1] As the truck had stopped backing up by the time she stopped her car, put it in park, and got out, the danger was over.

In *Leo v. Hillman,* the Vermont Supreme Court rejected a proposal to eliminate the requirement that the plaintiff must have been a potential victim of the defendant's negligence. 164 Vt. 94, 101–02 (1995). The policy concern was the potential significant expansion of claims that would result: "Such an action [*i.e.,* cause of action] would arise as an ancillary claim in nearly every tort resulting in death or serious injury. We decline to adopt such a rule." *Id.* at 102. The Court also rejected the argument that Vermont should abandon the 'zone of danger' test for a test based on foreseeability. Plaintiffs in this case advocate a change in the test for NIED in Vermont and advance a variety of reasons, but the standard defined in *Brueckner* remains the law in Vermont for NIED claims where there has been no physical contact. The *Brueckner* decision, which came four years after *Leo v. Hillman,* had the effect of reaffirming its ruling.

Plaintiff argues that there was a second zone of danger, allegedly created by Defendants, in the form of an area on the ground where brain matter, body parts, and blood were strewn, and argues that it was directed at her as a person who stopped to help. The court declines to treat this as a separate and distinct zone of danger. There were not two separate incidents from two different acts of alleged negligence, but one incident arising from the backing up of the truck. The consequences of the backing up took place in a continuous sequence. The debris on the ground was there as part of the single event. The backing up of the truck was the sole source of any danger, and whether it involved negligence or not, it was not directed at Ms. Zeno-Ethridge.

The court concludes that the undisputed facts show that Ms. Zeno-Ethridge was not at any time in a zone of danger negligently directed at her by Defendants.

The second element of the zone of danger test requires that a plaintiff was subjected to a reasonable fear of immediate personal injury. She testified consistently throughout discovery that she had no fear of personal injury during the incident.

In response to Defendants' Motion for Summary Judgment and Statement of Undisputed Facts, Plaintiffs submitted an affidavit from Ms. Zeno-Ethridge dated the day before the Opposition was filed. Paragraph 19 states as follows: "When I realized that I was standing in Mr. Kaminski's blood and bodily materials on March 11, 2016, and that I had those materials on my shoes and clothes, I experienced fear and concern for my own health and safety." Ex. 4 at 4 to Pls.' Opp'n. Defendants ask the court to disregard it based on the "sham affidavit doctrine," claiming that this was the first time such a statement was made despite extensive discovery

---

[1] The court does not reach any conclusion in this decision about whether any Defendant was negligent as it is unnecessary to do so. The outcome rests on the absence of facts to support other required elements.

including two days of deposition. A leading civil procedure treatise describes the doctrine as follows:

> It seems quite clearly correct to conclude that an interested witness who has given clear answers to unambiguous questions cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, without providing a satisfactory explanation of why the testimony is changed. If such an explanation is proffered and the new testimony presents a material issue of fact, summary judgment will be denied. Without an explanation for the discrepancy, however, there are no facts suggesting why a credibility question exists and the nonmoving party should not be allowed to manufacture a question of fact to delay resolution of the suit.

10A Wright& Miller, Federal Practice & Procedure: Civil § 2726.1 (4th ed.).

In response, Plaintiff points out that, in the First Amended Complaint filed in October of 2019, Plaintiff alleged that she "feared she might suffer contamination or infection from her exposure to the brain matter and bodily materials," and argues that Defendants' counsel failed to explore this with her during her deposition in 2021. Defendants' counsel argues in response that she was asked the following summary question at her deposition, after being asked other questions about whether she experienced fear: "And the entire time that you were at this scene you were never in fear for your own safety, were you?" Her answer was a simple "No" and she later completed an errata sheet without changing this answer. Plaintiff argues that this question was not sufficiently precise to elicit an answer pertinent to the effect of walking in body parts.

However, the question was comprehensive. It asked for her response about *any* fear for her own safety at *any* time during "the entire time that you were at this scene." This was the time for her to describe any fear she may have had during the entire time she was present. The element of fear was central to her claim and was an essential element of the cause of action she claimed and her basis for seeking recovery. Plaintiff's attorney claims that there is an explanation of why the testimony changed in that her PTSD "makes it difficult to accurately recall details of the event and her recollection changes, even though she always tries." (Pls.' Surreplyat 11, filed July 27, 2022 (citing Ex. 4, ¶ 3 to Pls.' Opp'n). However, this is insufficient to explain why she made no mention of this alleged moment of fear in response to the deposition question when she had been able to respond with specificity to numerous other questions about the event during the deposition. It is also insufficient to explain why she did not revise her testimony on the errata sheet when she had the chance after opportunity for reflection.

The element at issue is the second element of the zone of danger test: whether she was subjected to a reasonable fear of immediate personal injury. Fear was an essential element of the cause of action and her claim for relief. Her answer was an unequivocal "no." Even if the bodily materials on the ground constituted a second 'zone of danger,' a proposition which the court rejects, the affidavit contradicts testimony given during a deposition in which she was asked the specific question about fear *at any time that she was on the scene.*

The court concludes that the deposition questions posed by Defendant's counsel constituted sufficient exploration of any claim of fear for her own health and safety, and that her affidavit explanation of why her answer changed in response to the summary judgment motion is not satisfactory. This alone calls for the statement in paragraph three of her affidavit to be disregarded under the sham affidavit doctrine.

There is also another reason for disregarding it. The short paragraph in the affidavit is a highly generalized statement claiming "fear and concern" about her health and safety without identifying what immediate personal injury she was fearful about. There are no facts to support specific fears that she had when she realized she was standing where body parts were on the ground and some were on the bottoms of her shoes and pants. There are no facts showing that she sought follow-up evaluation of a potential medical risk about which she was fearful or had concerns at the time of the incident, which would provide support for the claim that she had fear at the time. Plaintiff's attorney argues that, in some other cases, courts have taken judicial notice of health concerns related to exposure to body fluids, but there is nothing to indicate such a concern on the part of Ms. Zeno-Ethridge at any time, and her exposure was limited to getting such material on the bottoms of her shoes and her pants.

A claim of "fear and concern" for "health and safety" could cover a broad range of types of fear and is susceptible to being highly subjective unless the reason or basis for it is identified. Some persons may experience generalized emotions of fear and concern from simply being in the presence of a dead body, no matter the cause, and may be unable to describe what they are fearful of. The threshold for 'fear and concern' can vary considerably from person to person. The claim of "fear" without specifics is simply too generalized to provide facts sufficient to contradict her specific deposition testimony that she had no fear of bodily injury at any time she was on the scene. It is a claim without facts, and thus does not raise a dispute of material fact.

Moreover, policy considerations do not favor recognizing the type of general allegation of "fear and concern" expressed in the affidavit. The restrictive rules developed for NIED claims serve an important gatekeeping function, limiting liability for emotional harms to circumstances involving physical harm, or risk of it, that can be supported by non-subjective, reliable facts. "[B]odily harm usually provides objective evidence of its existence and extent while the existence and severity of emotional harm is usually dependent upon the report of the person suffering it or symptoms that are capable of manipulation or multiple explanations." Restatement (Third) of Torts: Phys. & Emot. Harm § 4, cmt. b.

The United States Supreme Court has approved policy concerns as a limitation on availability of damages for emotional injuries as follows:

> Nearly all of the States have recognized a right to recover for negligent infliction of emotional distress, as we have defined it. No jurisdiction, however, allows recovery for all emotional harms, no matter how intangible or trivial, that might be causally linked to the negligence of another. Indeed, significant limitations, taking the form of "tests" or "rules," are placed by the common law on the right to recover for negligently inflicted emotional distress, and have been since the right was first recognized late in the last century.

7

Behind these limitations lie a variety of policy considerations, many of them based on the fundamental differences between emotional and physical injuries. "Because the etiology of emotional disturbance is usually not as readily apparent as that of a broken bone following an automobile accident, courts have been concerned . . . that recognition of a cause of action for [emotional] injury when not related to any physical trauma may inundate judicial resources with a flood of relatively trivial claims, many of which may be imagined or falsified, and that liability may be imposed for highly remote consequences of a negligent act." *Maloney v. Conroy,* 208 Conn. 392, 397–398, 545 A.2d 1059, 1061 (1988). The last concern has been particularly significant. Emotional injuries may occur far removed in time and space from the negligent conduct that triggered them. Moreover, in contrast to the situation with physical injury, there are no necessary finite limits on the number of persons who might suffer emotional injury as a result of a given negligent act. The incidence and severity of emotional injuries are also more difficult to predict than those of typical physical injuries because they depend on psychological factors that ordinarily are not apparent to potential tortfeasors.

For all of these reasons, courts have realized that recognition of a cause of action for negligent infliction of emotional distress holds out the very real possibility of nearly infinite and unpredictable liability for defendants. Courts therefore have placed substantial limitations on the class of plaintiffs that may recover for emotional injuries and on the injuries that may be compensable. See, *e.g., Thing v. La Chusa,* 48 Cal.3d 644, 654, 257 Cal.Rptr. 865, 870, 771 P.2d 814, 819 (1989) ("[P]olicy considerations mandat[e] that infinite liability be avoided by restrictions that . . . narrow the class of potential plaintiffs"); *Tobin v. Grossman,* 24 N.Y.2d 609, 616, 301 N.Y.S.2d 554, 559, 249 N.E.2d 419, 423 (1969). Some courts phrase the limitations in terms of proximate causation; that is, only certain plaintiffs or injuries are reasonably foreseeable. Other courts speak of the limitations in terms of duty; the defendant owes only a certain class of plaintiffs a duty to avoid inflicting emotional harm. See, *e.g.,* Pearson, *supra,* at 489, n. 72 (discussing *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928)). These formulations are functionally equivalent.

*Consol. Rail Corp. v. Gottshall,* 512 U.S. 532, 544–46, 114 S. Ct. 2396, 2405–06, 129 L. Ed. 2d 427 (1994).

The policy limitations are also described in a leading treatise on tort law: "It would be an entirely unreasonable burden on all human activity if the defendant who has endangered one person were to be compelled to pay for the lacerated feelings of every other person disturbed by reason of it, including every bystander shocked at an accident, and every distant relative of the person injured, as well as all h[er] friends." Prosser & Keeton on the Law of Torts § 54, at 366 (5th ed. 1984).

Given such policy limitations inherent in the standard, even if the affidavit statement is accepted as not a sham affidavit, the limited, subjective, generalized statement of "fear and concern" without greater specificity does not raise a dispute as to a material fact on the element of whether she had a "reasonable fear of immediate personal injury." Without it, the clear

8

deposition testimony is that Plaintiff had no fear of personal bodily injury at any time while she was at the scene. Thus, the second required element of the zone of danger test is not met.

The third necessary element is whether she in fact suffered substantial bodily injury or illness as a result. Plaintiff claims that she suffered PTSD and depression as a result of her experience. As stated above, the undisputed facts show that at the time of the incident, she was not in a zone of danger and suffered neither bodily injury nor fear of it. Because the first two of the three necessary elements are not present, it is not necessary to analyze whether she suffered substantial bodily injury or illness through PTSD or depression at a later time. If any one of the elements are not present, she is not able to succeed on an NIED claim based on the zone of danger test. In this case, two of the required elements are not met.

*Summary of NIED claim*

In sum, the undisputed facts show that Ms. Zeno-Ethridge cannot meet the requirements for a claim of NIED on either of the alternative grounds: physical impact or zone of danger. This does not mean that she did not experience negative emotional consequences from the incident. It simply means that the law of NIED as it has developed in Vermont has established requirements for those types of emotional distress claims for which compensation is available and those which, for policy reasons, it is not available. The legal standards have been established in decisions of the Vermont Supreme Court developed consistently over time through common law and govern the analysis of cases in the trial courts.

## Negligence

Ms. Zeno-Ethridge asserts a second claim which she bases on the law of negligence. A claim of negligence calls for proof of four elements: (1) a legal duty owed by defendants to the plaintiff, (2) a breach of the duty, (3) actual injury to the plaintiff, and (4) a causal link between the breach and the injury. *Montague v. Hundred Acre Homestead, LLC*, 2019 VT 16, ¶ 14, 209 Vt. 514. One of Defendants' arguments is that Defendants had no duty to her to prevent emotional distress because she voluntarily intervened in a situation that otherwise did not involve her. Another is that even if duty and breach were found, there is no proximate causation between any negligence of Defendants and the emotional harm claimed by Ms. Zeno-Ethridge.

She argues in response that the rescue doctrine applies, that facts support negligence by Defendants, and that she meets the requirements for extending a negligent actor's liability to a rescuer who seeks to prevent the harm caused by an actor's negligent act. She relies on *Wilford v. Salvucci*, 117 Vt. 495, 498 (1953) and *Keegan v. Lemieux Sec. Services, Inc.*, 2004 VT 97, ¶ 8. She argues that those requirements are: (1) the negligent acts of the defendant put a person in imminent peril or what could be perceived as imminent peril, (2) the plaintiff/rescuer sees or becomes aware of the imminent peril to the other person, (3) the plaintiff/rescuer acts with intent to aid or rescue the imperiled person, and (4) the plaintiff rescuer uses reasonable care in the attempt to rescue.

Defendants' response is that because Ms. Zeno-Ethridge is seeking emotional distress damages based on a claim of negligence, she must meet the requirements of a NIED claim, and cannot seek to circumvent those requirements with a claim cast as a separate negligence claim. The court concludes that this analysis is persuasive. Moreover, it is supported by the Restatement of Torts on grounds of policy.

The law of NIED developed to curb the possible widespread growth of liability based on individual emotional reactions to events, which can vary significantly from one person to the next. Thus, when there is a claim of negligence, and the harm claimed is emotional distress and there has been no injury to the plaintiff's body, the claim is governed by the requirements for an NIED claim. A plaintiff may not pursue a claim based on "classic" negligence to avoid the requirements that apply when the alleged harm is emotional distress unaccompanied by physical bodily harm. Restatement (Third) of Torts: Phys. & Emot. Harm § 4, cmt b.

This case falls into that category: because there was no physical contact on Ms. Zeno-Ethridge's body during the incident and the alleged harm is emotional damage, the case must be brought exclusively as an NIED claim. Ms. Zeno-Ethridge seeks recovery based on the rescue doctrine, but that can only be invoked when there is a cognizable claim of negligence. A rescuer cannot bring a negligence claim at all if the damages are exclusively based on emotional consequences unaccompanied by physical contact.

Thus, damages based on a claim of negligence are not available to Ms. Zeno-Ethridge.


Loss of Consortium

Because this cause of action is a derivative claim that depends on establishing liability for one or more of the tort liability claims, and no such liability has been established, Defendants are entitled to summary judgment on this claim as well.

Summary

For the foregoing reasons, the motions for summary judgment filed on behalf of all Defendants are granted as to all claims:

Motion #2, filed March 21, 2022, is *granted.*
Motion #3, filed March 22, 2022, is *granted.*

A separate Judgment is issued this day.

Electronically signed February 10, 2023 pursuant to V.R.E.F. 9 (d).

Mary Miles Teachout
Superior Judge (Ret.), Specially Assigned

10